**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**PETER KEVIN LANGAN,**

        **Petitioner,**

    **v.**                       **Civil No. 2:02-cv-832**
                                     **Crim. No. 2:96-cr-015**
                                     **Judge Holschuh**
                                   **Magistrate Judge King**

**UNITED STATES OF AMERICA,**

        **Respondent.**

## OPINION AND ORDER

Petitioner, a federal prisoner, brings this motion to vacate, correct, or set aside sentence pursuant to 28 U.S.C. §2255.  This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, petitioner's supplemental motions to the petition, and the exhibits of the parties.  Petitioner's unopposed request that the Whitehurst documents filed under seal in this case be unsealed, *see Traverse,* at 10, is **GRANTED**.  Petitioner's motion for reconsideration (Doc. #568) of the Court's December 2, 2004, order (Doc. #567) is **DENIED.**

Additionally, for the reasons that follow, this action is hereby **DISMISSED**.

### I. FACTS

This case involves the following facts, as summarized by the United States Court of Appeals for the Sixth Circuit:

> Peter Kevin Langan was convicted by a jury of robbing two banks,
> in violation of 18 U.S.C. § 2113, and of using firearms and a
> destructive device in committing the robberies, in violation of 18

U.S.C. § 924(c). In a separate trial concerning the circumstances of his arrest on unrelated charges, Langan was convicted of assaulting federal officers, in violation of 18 U.S.C. § 111, and of further firearms offenses. Langan's convictions from both trials were consolidated for sentencing purposes and resulted in life imprisonment without the possibility of parole, plus 35 years.

***

## I. BACKGROUND

Langan, who used the alias "Commander Pedro," led a small, white-supremacist group known as the Aryan Republican Army ("ARA") and, at times, as the Midwestern Bank Bandits. In 1991, he and his childhood friend, Richard "Wild Bill" Guthrie, founded the ARA after attending a Christian Identity meeting. The ARA was a copycat, neo-Nazi group inspired by the book *The Silent Brotherhood,* which detailed the exploits of an underground guerrilla bank robbery gang known as "The Order." In the mid-1990s, the ARA committed a number of bank robberies throughout the midwest to support their avowed purpose of committing terrorist acts against the United States government. A portion of the proceeds from the bank robberies was then funneled to similar neo-Nazi causes, while the remainder was used to finance future robberies. Before his trial, Langan informed a Pretrial Services Officer that he had been a "self-employed revolutionary" with the goal of "overthrowing the government."

In the fall of 1993, Langan went underground, breaking off all contact with his family and friends and staying in various motels. Langan, Guthrie, and an associate Shawn Kenny attempted to rob Society National Bank ("SNB") in Springdale, Ohio during this period. Armed and wearing bulletproof vests, they drove to the bank. They brought with them disguises, a mock explosive device, and a police scanner. For reasons not made clear in the record, they abandoned their plans to rob the bank on the day in question.

On June 8, 1994, however, SNB was robbed shortly after it opened. The robbery was carried out by two armed gunmen wearing Richard Nixon and Ronald Reagan masks. One of the robbers ordered everyone to the floor and removed money from the teller drawers while the other gunman stood watch in the lobby of the bank. The robbers stole $11,890 in federally insured funds that were attached to a dye pack. A dye pack is a safety device that is disguised as an ordinary, unused pack of currency. Soon after it

passes through the magnetic field of the bank's doors, the dye pack is designed to explode, releasing red smoke, tear gas, and red dye.

While the robbers were driving away from SNB in a brown Chevy Citation, the dye pack exploded. The robbers threw some of the money out of the window as they fled the scene. They then abandoned the getaway car less than a block from the bank. The car was later discovered to be registered to "Ed McMahon," one of Guthrie's aliases. Inside the car, the police recovered a Mark-21 practice hand grenade, a $20 bill with red-dye stain, and a police scanner.

Later that month, Guthrie met with Kenny in Cincinnati and gave him approximately $200 to compensate him for his "earlier ventures," including the aborted attempt to rob SNB in the fall of 1993. The money was stained with red dye. Guthrie informed Kenny that he and Langan had been successful in robbing the bank on their second attempt, and that they had used a "takeover" command style as employed by "The Order" bandits in *The Silent Brotherhood.*

Four months later, on the morning of October 25, 1994, two masked men robbed the Columbus National Bank ("CNB") soon after it opened. Guthrie had purchased a .22-caliber rifle in the Columbus area on the previous day. During the CNB robbery, the gunmen wore construction overalls, ski masks, hard hats, sunglasses, and gloves. The men ordered everyone to the floor and shouted to one another using Spanish phrases such as "andale, andale" and "la bomba." At Langan's trial, Kenny testified that this diversionary technique was used by the white supremacists in *The Silent Brotherhood* in an attempt to divert the attention of authorities by passing themselves off as Hispanic. One of the robbers remained in the lobby to control the customers while the other drew his gun and jumped over the counter to collect the money. As he was taking the money from the teller drawers, he removed his ski mask, hard hat, and sunglasses and left them on a teller counter. The robbers stole $3,400 in federally insured funds from the bank.

CNB's assistant manager, Lisa Copley, later identified Langan as the robber. Copley testified at Langan's trial that she had seen his face clearly for about three seconds as he progressed down the teller line. When he took off the disguise, Langan was approximately four feet away from Copley, but he came within

3

"touching distance" as he emptied the drawers. She saw him again when he returned to her area after attempting to steal money from the drive- up window. Following the incident, Copley described the robber as a white male, in his mid-thirties, weighing 165 pounds, 5 feet 8 inches tall, clean- shaven with dark hair and a medium build.

After the gunmen exited CNB, a black lunchbox containing a plastic pipe covered with wires was discovered behind a counter. The bomb was left at the scene to sow confusion and further divert police attention. A bomb squad was called to the scene, and the bank was evacuated. Upon arrival at the bank, bomb squad personnel photographed the device and then used a Nutrex Disruptor water cannon to render the pipe bomb safe. The Disruptor separated the components of the bomb without detonation.

These components were sent to the FBI laboratory for analysis. Steven Burmeister, an FBI toxicologist, conducted a chemical analysis on a powder sample from the device and concluded that it was composed of "nonperforated disk double-based smokeless powder" and a nonexplosive white powder consisting of calcium sulfate, calcium carbonate, silicon dioxide, and aluminum compounds. At Langan's trial, Burmeister was qualified as an expert in forensic chemistry, specializing in the analysis of explosives and explosive residues in general, and pipe bombs in particular. He testified that smokeless powder is an explosive that is sensitive to heat, shock, and friction, and although it would burn more slowly because of the presence of the nonexplosive white powder, its explosive propensities were otherwise unaffected.

The other FBI expert to testify was Robert Heckman, a hazardous devices and explosives examiner, who addressed the engineering aspects of the device. He examined a photograph of the device before it was rendered safe, as well as the recovered debris. Relying upon Burmeister's characterization of the powder mixture as an explosive, Heckman determined that the device was capable of explosion. Furthermore, he determined that although it did not contain an "apparent classic initiator," it could explode by mishandling alone, such as by "dropping the pipe" on the ground. He also found that the device was equipped with an electric circuit hooked to a pager and powered by two nine-volt batteries, as well as a mercury switch. Based on these findings, he concluded that the device was "objectively a pipe bomb."

4

After being qualified as an expert in explosive and hazardous devices, Heckman testified that the pipe bomb contained the necessary components for a destructive device. He went on to state that, "properly assembled and initiated," the device "would explode, would cause property damage, personal injury, and possibly death." Heckman indicated, however, that he could not determine whether the mercury switch was operable before destruction because not enough fragments of the switch had been recovered to properly reconstruct the switch. He also testified that the wires appeared not to have been crimped properly for conduction, making it doubtful whether this method of detonation would have been successful or had even been intended.

In January of 1996, Langan was seized by a combined state-federal law enforcement team outside of a "safe house" in Columbus. The safe house was used by the ARA to store ammunition, firearms, and other bank robbery equipment. Guthrie had been captured three days earlier and had betrayed Langan, providing the authorities with critical details about their bank robbery exploits and with the location of their safe house. Based on Guthrie's information, law enforcement officials executed a raid on the property. The officers testified that they saw Langan brandishing a semi-automatic handgun from the back window of his van. They then riddled the van with more than 50 bullets, but Langan survived the gunfire with minor injuries and was placed under arrest. This dramatic confrontation was the subject of local television news stories. Copley was among those who saw the television coverage of Langan's capture. She testified at trial that when she saw the report, she instantly thought that Langan was the same man who had robbed CNB.

Law enforcement agents found several items in the safe house and the van that were connected to the SNB robbery. A Mark-21 grenade was discovered in a suitcase that was identified as belonging to Langan. The grenade had Langan's fingerprint on the hose clamp and was similar to the Mark-21 grenade found in the glove compartment of the getaway car used in the SNB robbery. Agents also recovered a pair of blue and white leather gloves with red-dye stain on them. An FBI chemist determined that the chemical make-up of the red dye was the same as the dye found on the $20 bill recovered from the SNB getaway car. A Ronald Reagan mask, similar to the masks worn during the SNB robbery, was found in Langan's van, as was a black lunchbox similar to the

one containing the CNB pipe bomb. Two copies of *The Silent Brotherhood* were seized from the house. Officers also recovered hard hats, ski masks, and sunglasses that were identical to those left behind after the CNB robbery.

On February 15, 1996, a federal grand jury returned a seven-count indictment, charging Langan with the January assault on federal officers, in violation of 18 U.S.C. § 111, carrying and using firearms in connection to the assault, in violation of 18 U.S.C. §§ 2, 922(g), and 924(c), and failing to register a destructive device in violation of 26 U.S.C. § 5861(d). A superseding indictment was returned by the grand jury on March 16, 1996, incorporating the charges of the earlier indictment and alleging that Langan had committed two counts of armed bank robbery, in violation of 18 U.S.C. §§ 2 and 2113(a) & (d), two additional counts of using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c), and one count of using and carrying an explosive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). These later charges all related to the SNB and CNB robberies.

On March 18, 1996, Copley was interviewed by an FBI agent and shown a photo array. She informed the agent that she had seen Langan on television in connection with the January 1996 shootout. Copley went on to express her concern that "I hope I don't recognize this individual from T.V." When shown the photos, however, Copley did not hesitate in selecting Langan's. It was the first and only one she selected among the array.

Langan filed a motion to sever the bank robbery and related firearm charges of the superseding indictment from the original assault and firearms counts. The district court granted his motion, resulting in Langan being tried in two separate proceedings. Langan also moved to exclude Copley's testimony. The court denied the motion, as well as Langan's motion to present the expert testimony of David F. Ross, a psychologist at the University of Tennessee. Langan sought to offer Dr. Ross's testimony in order to undermine Copley's eyewitness identification.

The district court recognized Dr. Ross as an expert in psychology solely for the purpose of a suppression hearing regarding Copley's identification of Langan. It reserved ruling on whether Dr. Ross would be qualified to testify at trial in the subspecialty of eyewitness identification. At the suppression hearing, Dr. Ross testified regarding a variety of factors that had the potential of

6

affecting the accuracy of Copley's identification. These factors included the 14 month delay between the CNB robbery and the photo array, the distractions created by the robber's gun and the stress of the situation, and her exposure to his capture on television news. Dr. Ross also criticized the identification procedures used by the FBI in the photo array. The district court determined, under the tests set forth in *Neil v. Biggers,* 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), that (1) Copley's testimony was sufficiently reliable to be presented to the jury, and (2) Langan had failed to meet his burden of proving that the photo array was impermissibly suggestive.

Dr. Ross was also prepared to offer a more specific discussion concerning the possibility of "memory transference," or what Dr. Ross referred to as "conscious inference" or "conscious transference." This phenomenon is the misidentification of a familiar but innocent person, more commonly called "*unconscious* transference" (although Dr. Ross takes issue with this label, based on his theory of how the process occurs in the brain). Dr. Ross's testimony would have proposed an alternative explanation for Copley's identification, suggesting that Copley was not recognizing Langan from the CNB robbery, but instead from the more recent television news coverage, even though she may have believed that she was identifying Langan from both. He had co-authored an article on the subject, *Unconscious Transference and Mistaken Identity: When a Witness Misidentifies a Familiar but Innocent Person,* 79 Journal of Applied Psychology 918 (1994).

Following a *Daubert* hearing, the district court refused to allow Dr. Ross to testify at trial as an expert in eyewitness identification. The court determined that Dr. Ross's proposed testimony failed to meet the requirements of Rule 702 of the Federal Rules of Evidence as interpreted by *Daubert* and its progeny. Using the two-part test developed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the district court concluded that Dr. Ross's proposed testimony on the factors influencing eyewitness accuracy would not have assisted the jury. Instead, the court determined that any testimony offered by Dr. Ross would have improperly invaded their province.

The district court also held that Dr. Ross's testimony concerning the transference theory was not sufficiently based on "scientific knowledge," because it failed to meet the reliability standards established by *Daubert*. Citing Dr. Ross's own 1994 article, the

court noted that Dr. Ross had personally called the theory into question when commenting that the "literature provides mixed and somewhat weak support for unconscious transference" and that "the empirical evidence for the [theory's] existence is rather meager." The district court pointed out that even though Dr. Ross was given the opportunity at the suppression hearing to state that the theory was scientifically sound, he failed to effectively rebut the government's criticism of the theory. Moreover, the court found that Dr. Ross's methodologies were inadequate because he had never studied any victim or eyewitness of a bank robbery.

Finally, the district court questioned Dr. Ross's qualifications in the specific field of "adult eyewitness identification." It noted that the great majority of Dr. Ross's work had focused on child eyewitness identification. The court also found it significant that Dr. Ross had been qualified to testify as an expert only once before, and in that instance his testimony related to a child eyewitness in a state court proceeding.

During the 22-day jury trial, the government presented more than 60 witnesses. The most important of these witnesses were two of Langan's coconspirators, Shawn Kenny and Kevin McCarthy. Kenny had been affiliated with the ARA from the time it began operations and had been part of the "dry run" at the SNB in 1993. Guthrie, Langan's chief cohort, had told Kenny that the second attempt at SNB had proved successful. As compensation for Kenny's efforts, Guthrie paid him with red-tinted money. McCarthy, an ARA member who was recruited shortly after the CNB robbery, testified that Langan told him that Langan had injured his knee while jumping over a teller counter and lost his mask during an earlier robbery. Guthrie was to have been a witness at the trial, but he hung himself in his prison cell in July of 1996. The government also presented substantial physical evidence recovered from the safe house that tied Langan to the robberies.

In February of 1997, the jury found Langan guilty on all counts related to the two bank robberies. Langan was found guilty by a second jury in October of 1997 on charges related to the assault on federal officers. For sentencing purposes, Langan's convictions were consolidated and resulted in a life sentence without the possibility of parole, plus 35 years. Langan was also ordered to pay restitution of $6,270 and a $400 fine. He filed this timely appeal in January of 1999.

*United States v. Langan*, 263 F.3d 613, 615-20 (6th Cir. 2001).

## II. PROCEDURAL HISTORY

On February 15, 1996, the federal grand jury for the Southern District of Ohio, Eastern Division, returned an indictment charging petitioner with assault on F.B.I. agents Jeffrey C. Lindsey and Michael J. Erbach, in violation of 18 U.S.C. §111, four counts of use of a firearm and carrying a pipe bomb during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c), possession of firearms by a convicted felon, in violation of 18 U.S.C. §§922(g) and 924(a)(2), and possession of an unregistered destructive device, in violation of 18 U.S.C. §§5861(d), 5871 and 18 U.S.C. §2. Doc. #8.[1] On March 19, 1996, a superseding indictment was filed additionally charging petitioner with the June 8, 1994, armed bank robbery of $11, 890.00 from the Society National Bank ("SNB") in Springdale, Ohio, and the October 25, 1994, armed bank robbery of $3,400.00 from the Columbus National Bank ("CNB") in Columbus, Ohio, in violation of 18 U.S.C. §2113(a), (d), and 18 U.S.C. §2, two counts of use of a firearm during and in relation to a crime of violence, and use of a pipe bomb during and in relation to a crime of violence, in violation of 18 U.S.C. §924(c) and 18 U.S.C. §2. Doc. #32. On December 16, 1996, while represented by counsel, petitioner proceeded to jury trial on counts one through five of the superseding indictment. On February 10, 1997, petitioner was found guilty, as charged. Doc. #292. On August 25, 1997, represented by the same counsel, petitioner proceeded to jury trial on the remaining charges. On October 7, 1997, petitioner was found guilty of assaulting F.B.I.

---

[1] In his traverse, petitioner states that he has never received a copy of the indictment or superseding indictment. Petitioner's allegation is incredible. Pursuant to Federal Rule of Criminal Procedure, Rule 10, petitioner must be provided with a copy of the indictment at his arraignment. The docket, as well as the numerous post-indictment motions filed by petitioner, including a motion for a bill of particulars, and a motion to strike surplusage from the indictment, indicate that the provisions of Rule 10 were satisfied and that petitioner was advised of the charges against him. *See* Docs. #2, 5, 18, 20.

agents (count six), possession of firearms by a convicted felon (count eleven), and possession of

an unregistered pipe bomb (count twelve); the jury was unable to reach a verdict on counts eight,

nine, and ten. Doc. #440. On December 18, 1998, petitioner was sentenced to life imprisonment

without release plus thirty-five years. Doc. #495. Represented by new counsel, petitioner filed a

timely appeal to the United States Court of Appeals for the Sixth Circuit. Doc. #496. He raised

the following claims:

> (1) the district court erred when it excluded a psychologist's expert testimony on
> the reliability of eyewitness identification, (2) the evidence was insufficient to
> establish that the device left at one of the banks was a "destructive device," and
> (3) none of his convictions under 18 U.S.C. § 924(c) should be considered a
> "second or subsequent" conviction that warrants a mandatory life sentence
> without parole.

*United States v. Langan*, 263 F.3d 613 (6th Cir. 2001), Doc. #509. On August 30, 2001, the

Sixth Circuit affirmed petitioner's convictions and sentence. *Id.*

On August 23, 2002, petitioner filed the instant *pro se* motion to vacate, set aside, or

correct sentence pursuant to 28 U.S.C. §2255. He asserts the following claims:

> 1. Denial of effective assistance of trial and appellate counsel.
>
> 2. Denial of the right to appeal.
>
> 3. The conviction was obtained by an unconstitutional failure of
> the prosecution to disclose to the defendant favorable evidence.
>
> 4. Conviction obtained by action of a grand and or petit jury that
> was unconstitutionally selected and or impaneled.
>
> 5. The failure of the Court to grant severance of the two bank
> robbery counts in this case.
>
> 6. Denial of a fair trial due to the inability to confront the deceased
> witness Richard Guthrie and or be able [sic] to impeach his
> statements to third parties.

10

7. The sentencing of the defendant to life without release when it is beyond the statutory maximum for armed robbery, the issue of this offense being a second or subsequent offense never went to the jury.

8. The failure of the Court to grant a change of venue in this case due to pre-trial publicity.

9. The Court's reversal of its order granting a jury view of the scene of the shooting, when in this case it was essential to the defendant that a trier of fact be able to see this area to rebut the testimony of the agents that shot the defendant.

10. The issue of the denial of the defendant's right to a fast and speedy trial. The defendant's trials did not take place in a fast and speedy manner.

11. The refusal of the Court to grant a downward departure due to mental illness, and the U.S. Sentencing Guidelines failure to allow for such a downward departure for any violent crime.

It is the position of the respondent that petitioner's claims are either without merit, or barred from federal habeas corpus review due to petitioner's unexcused procedural default.

### III. CLAIM ONE - INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his first claim for relief, petitioner asserts the ineffective assistance of counsel. The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

11

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Strickland*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

Petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to retain qualified expert defense witnesses. Petitioner complains that Dr. David F. Ross, the defense expert on eyewitness identification hired to impeach Lisa Copley's identification of petitioner as one of the CNB robbers, was unqualified. He argues that his attorney should have obtained another properly qualified expert on eyewitness identification after the Court refused to permit Ross to testify. Petitioner also asserts that his attorney failed to properly investigate Ross' qualifications or Ross' research on the "transference theory" prior to trial. *See Petition*, at 20.

The United States Court of Appeals made the following relevant findings in rejecting petitioner's claim that Ross should have been permitted to testify as a defense expert:

12

Rule 702 of the Federal Rules of Evidence states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *Daubert,* the Supreme Court held that, when faced with a proffer of scientific expert testimony, Rule 702 requires a district court to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. As part of its review, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93, 113 S.Ct. 2786. Such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community should be considered in this review. *See id.* at 593-94, 113 S.Ct. 2786. This inquiry is a flexible one, with an overarching goal of assessing the "scientific validity and thus the evidentiary relevance and reliability" of the principles and methodology underlying the proposed expert testimony. *See id.* at 594-95, 113 S.Ct. 2786.

The use of expert testimony in regard to eyewitness identification is a recurring and controversial subject. Trial courts have traditionally hesitated to admit expert testimony purporting to identify flaws in eyewitness identification. Among the reasons given to exclude such testimony are that the jury can decide the credibility issues itself, *see United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir.1999) (determining that the "proposed testimony intrudes too much on the traditional province of the jury to assess witness credibility"); that experts in this area are not much help and largely offer rather obvious generalities, *see United States v. Hudson*, 884 F.2d 1016, 1024 (7th Cir.1989) ("Such expert testimony will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding of the particular dispute."); that trials would be prolonged by a battle of experts, *see United States v. Fosher*, 590 F.2d 381, 383-84 (1st Cir.1979) (adding "to the trial court's articulated concerns our own conviction that a trial court has the discretion to avoid imposing upon the parties the time and expense involved in a battle of experts"); and that such testimony creates undue opportunity for confusing and misleading the jury, *see United States v. Rincon*, 28 F.3d 921, 926 (9th Cir.1994) ("Given

the powerful nature of expert testimony, coupled with its potential to mislead the jury, we cannot say the district court erred in concluding that the proffered evidence would not assist the trier of fact and that it was likely to mislead the jury.").

Several courts, however, including our own, have suggested that such evidence warrants a more hospitable reception. *See United States v. Smithers*, 212 F.3d 306, 314 (6th Cir.2000) (holding that "the district court abused its discretion in excluding [the eyewitness identification expert's] testimony, without first conducting a hearing pursuant to *Daubert*"); *United States v. Smith,* 156 F.3d 1046, 1053 (10th Cir.1998) (agreeing that "expert testimony on eyewitness identification may properly be admitted under *Daubert* in certain circumstances"); *United States v. Brien*, 59 F.3d 274, 277 (1st Cir.1995) (declining to adopt a blanket rule that qualified expert testimony on eyewitness identification must either be routinely admitted or excluded); *United States v. Amador-Galvan*, 9 F.3d 1414, 1417-18 (9th Cir.1993) (declining to follow a *per se* rule excluding expert testimony regarding the credibility of eyewitness identification). Moreover, such testimony has been allowed in with increasing frequency where the circumstances include "cross-racial identification, identification after a long delay, identification after observation under stress, and [such] psychological phenomena as ... unconscious transference." *See United States v. Harris*, 995 F.2d 532, 535 (4th Cir.1993). Nonetheless, each court to examine this issue has held that the district court has broad discretion in, first, determining the reliability of the particular testimony, and, second, balancing its probative value against its prejudicial effect. *See e.g., United States v. Hall*, 165 F.3d 1095, 1101 (7th Cir.1999); *United States v. Kime,* 99 F.3d 870, 883 (8th Cir.1996).

The district court in the case before us did not automatically exclude Dr. Ross's testimony. Instead, it considered the matter in detail after conducting a lengthy *Daubert* hearing and specifically acknowledged the Sixth Circuit's willingness to accept psychological studies as a scientifically sound and proper subject of expert testimony. In fact, the court pointedly distinguished the circumstances presented in Langan's case from those in *United States v. Smith,* 736 F.2d 1103 (6th Cir.1984), where this court noted that the science of eyewitness perception has achieved the level of "exactness, methodology, and reliability of any psychological research." *Id.* at 1106. The *Smith* court held that the district court had abused its discretion in excluding an expert in

14

eyewitness identification because "[s]uch testimony might have been relevant to the exact *facts* before the court and not only might have *assisted* the jury, but might have refuted their otherwise common assumptions about the reliability of eyewitness identification," thus satisfying the "helpfulness test" of Rule 702. *Id.* at 1106 (emphasis in original).

In *Smith*, the government had conceded that the proposed expert was, in fact, an expert, and none of the eyewitnesses could identify Smith from a photo spread three weeks after the robbery in question, although they all identified Smith at an FBI line-up four months later. *See id.* at 1104-05. Despite the *Smith* court's holding, the district court in the case before us determined that Dr. Ross's testimony was "within the jury's own knowledge" as it related to the general psychological factors affecting memory and would therefore not be of assistance.

The district court also held that Langan had failed to establish the reliability of Dr. Ross's testimony regarding the "transference theory," even though Copley's identification presented a specific cognitive problem not common to all or even most eyewitness identifications and Copley herself had put the identification at issue. As a basis for this finding, the court pointed to Dr. Ross's only published article on the subject, concluding that "the plain language of the article is that the theory of unconscious transference is as yet empirically unproven and further research is necessary before the theory can be confirmed or disconfirmed."

Dr. Ross, who was questioned about this article at the suppression hearing, defended his position by stating that the transference phenomenon existed but should be renamed "conscious transference" or "conscious inference," because the eyewitness has a conscious recollection of the previous exposure to the innocent person in a lineup. His article, however, criticizes the overall theory by characterizing the empirical evidence as "rather meager." The article goes on to note that his experiments "have a number of limitations," including "limited external validity" and "limited generalizability." Moreover, "the theoretical notions described here need modification and further development, and they are proposed in terms of encouraging research in this area and not in terms of providing the definitive word on this fascinating and important topic."

The district court thus had justification for concluding that, by any name, the theory failed to meet the requisite reliability standards.

At the *Daubert* hearing, Langan had the opportunity to establish whether Dr. Ross had conducted any further research to confirm his interpretation of the transference theory. Three years had passed since his article was published, yet Langan failed to demonstrate that the "limitations" on Dr. Ross's research no longer existed. The district court was therefore left with Dr. Ross's criticism of the general theory, including his own interpretation of conscious transference, without any showing that the theory had been subjected to further testing or been confirmed scientifically. Although Dr. Ross did not, as the government argues, "debunk" the phenomenon of misidentification, the district court did not abuse its discretion when it determined that Dr. Ross's proffered testimony lacked the requisite indicia of reliability. Such indicia would include empirical support for the theory, whether it had been subjected to peer review, and whether the theory enjoyed general acceptance within the field of eyewitness identification. *See Daubert*, 509 U.S. at 593-95, 113 S.Ct. 2786.

The district court also found it significant that Dr. Ross had never before been qualified as an expert in federal court, and only once before in state court as an expert in child eyewitness identification. This is in contrast with the expert in *Smithers*, whose "qualifications and scientific methods" had already been "praised" by the Sixth Circuit. *See Smithers*, 212 F.3d at 315. The district court further faulted Dr. Ross's methodology because he had never included a victim or eyewitness to a bank robbery in his studies. Although this fact appears to be more relevant to whether the opinion "fits" the case and is helpful, we cannot say that the district court erred in concluding that it undermined the scientific underpinnings of Dr. Ross's proffered opinion in this case.

Another of the district court's reasons for finding that Dr. Ross's testimony did not constitute "scientific knowledge" is more problematic. The district court questioned his ability to qualify as an expert in the subspecialty of "adult eyewitness identifications," because the bulk of Dr. Ross's research focused on child eyewitness testimony. Dr. Ross, however, had published articles, edited books, and given lectures dealing specifically with misidentification in adult witnesses. The fact that he has spent more time and effort studying children should not have disqualified him from testifying about the misidentification phenomenon in adults. To demand that there be a specific qualification in "adult eyewitness identification" is unjustified unless there exists some principled distinction between the

16

methods, theory, and results used in the study of misidentification by adults as opposed to misidentification by children.

Despite our hesitation to adopt all of the district court's criticisms concerning Dr. Ross's proffered testimony under the "scientific knowledge" prong of *Daubert,* we agree that it failed to satisfy the second *Daubert* inquiry. This second step requires the district court to consider whether the proposed scientific evidence fits the issue to which the expert is testifying. *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. In other words, a district court may admit the evidence only if such testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue. The proposed testimony must thus "fit" the eyewitness identification in this case.

Dr. Ross's proposed testimony was being offered in order to impeach Copley's identification of Langan. His testimony, however, would not have been based on any personal knowledge of Copley, but rather on his general knowledge about the type of circumstances in which she had found herself. Dr. Ross would have testified to the limitations regarding Copley's ability to see and identify the bank robber during the robbery, her ability to identify the robber eighteen months after the robbery, the transference phenomenon related to her having seen Langan on television prior to the photo array, and the "psychologically-based weaknesses in the method used by the FBI at the photo array."

Although we recognize that expert testimony on eyewitness identification might inform the jury on all of the intricacies of perception, retention, and recall, we nevertheless agree with the district court that the hazards of eyewitness identification are within the ordinary knowledge of most lay jurors. With regard to the possibility that Copley was remembering Langan from television rather than from the CNB robbery, Langan's counsel had ample opportunity to cross-examine her on this point, and in fact did so at trial. The district court also was highly skeptical of this specific area of testimony because of the limitations that Dr. Ross had personally raised concerning the subject. If he had testified at trial, it is likely that an uninformative battle of experts would have occurred if the government had offered its own expert testimony in order to refute Dr. Ross's opinion, and the jury could have been unduly misled and confused.

Furthermore, as this court noted in *Smithers*, the numerous cases holding that the exclusion of expert testimony on eyewitness

17

identification is not an abuse of discretion caution us to consider whether the testimony would have been helpful or confusing to the jury. *See Smithers*, 212 F.3d at 314. These "cases also discuss whether this type of testimony touched on the 'ultimate issue' in the case and therefore usurped the jury's role; whether there was other evidence against the defendant; and whether the jury could more properly evaluate the reliability of eyewitness testimony through cross-examination." *Id*.

Our conclusion that the district court did not abuse its discretion in this case is further supported by the fact that Langan had the opportunity to thoroughly cross-examine Copley in order to cast doubt on her ability to identify him. As we have explained, weaknesses in eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitness. Copley herself was the one who expressed initial concern that she was remembering Langan from his appearance on television. She brought up this possibility during her direct examination by the government, and she was thoroughly cross-examined by Langan's counsel on this issue. The jury was therefore able to consider this possible "transference" during its deliberations. In addition, the jury was cautioned about the "shortcomings and trouble spots" of eyewitness identification in the final jury instructions.

Moreover, Copley showed other indicia of having made a reliable identification. Her initial description of the suspect was consistent with Langan's own physical characteristics. She immediately recognized Langan as the robber when she saw him on television. Besides her responsibilities as an assistant manager at CNB, Copley also served as an aviation electronics technician with the Air Force National Guard. Her national guard training required her to participate on an annual basis in combat and hostile threat situations. During these exercises, she received training in identifying individuals attempting to enter unauthorized areas. She testified that a critical component to this training was the need to remain calm and focused during the attempted takeovers. In light of this specialized training, Dr. Ross's generalized testimony regarding such distracting factors as stress and the presence of a gun would not necessarily have helped the jury in evaluating Copley's identification of Langan.

Finally, a substantial amount of other evidence linked Langan to the CNB robbery. Two coconspirators, for example, testified regarding his involvement. When Langan was arrested, law

18

enforcement officials recovered masks and hardhats similar to those found in the CNB getaway car. A silver semi-automatic pistol, like the one Copley identified as used by Langan at the robbery, was also recovered from the safe house. In addition, a white-plastic pipe bomb that closely resembled the one used in the CNB robbery was discovered in a suitcase belonging to Langan, and Langan's thumbprint was found on bomb-making equipment in the same suitcase. Thus abundant evidence to support the jury's verdict existed even without Copley's eyewitness identification..

*United States v. Langan*, 263 F.3d at 620-625.

As discussed by the United States Court of Appeals for the Sixth Circuit, a federal district court  has broad discretion in determining whether to permit expert testimony.  As the Sixth Circuit found, the exclusion of petitioner's proposed expert witness, Dr. Ross, by the District Court was not based solely on the question of Dr. Ross' qualifications as an expert on eyewitness identification, but it was also based on a failure to satisfy the second requirement of *Daubert, i.e.*, that the proposed scientific evidence fits the issue in the particular case under consideration. In short, as the Sixth Circuit put it, "the proposed testimony must 'fit' the eyewitness identification in this case" and, for the reasons stated by the Court of Appeals, that requirement was not met in this case.  A search for another expert with better qualifications (and there is no evidence that such an expert exists) would not have resulted in any change in the opinion of the District Court regarding the second requirement of *Daubert.*  Further, even assuming that defense counsel could have obtained another more qualified expert witness on the hazards of eyewitness identification, and that such testimony would have been permitted, petitioner has failed to establish prejudice under the second prong of *Strickland.*  Defense counsel thoroughly cross-examined Copley regarding her identification of petitioner, and there was "abundant other evidence to support the jury's verdict even without Copley's eyewitness identification." *See*

19

*United States v. Langan, supra.*

Petitioner similarly alleges that Dr. Henry Leland was improperly qualified in the area of gender identity disorder and that defense counsel therefore poorly presented this issue at petitioner's assault trial and at sentencing. *See Petition*, at 5.[2] However, petitioner fails to indicate, and this Court is unable to discern from the record, in what manner an expert in gender identity disorder would have assisted in petitioner's defense or in obtaining a reduced sentence. Additionally, contrary to petitioner's allegation, defense counsel raised the issue of petitioner's gender identity disorder at sentencing. *See Motion to Determine Present Mental Condition of Defendant and for Custody for Care or Treatment in a Suitable Facility*, Doc. #441; *Second Motion for Custody for Care or Treatment in a Suitable Facility*, Doc. #479. Additionally, a letter written by defense counsel to petitioner on July 1, 1998, indicates that, contrary to petitioner's allegations, defense counsel had thoroughly investigated petitioner's mental health issues and had considered whether and when to again raise such issue. *See Petitioner's Exhibit A-1,* attached to *Traverse.*

Petitioner asserts that he was denied the effective assistance of counsel because his attorneys ignored his requests for mental health treatment and failed to obtain a psychological assessment. *Traverse,* at 29. Petitioner states that his attorneys were "deliberately indifferent" to his medical and mental health issues. He argues that he may have been insane at the time of trial, and now alleges that the use or discontinued use of psychotropic drugs impaired his ability to prepare for trial and to assist in his defense. *Petition*, at 5.

---

[2] On May 29, 1996, Leland performed a mental status assessment of petitioner at the request of defense counsel. *See* Doc. #443 (filed under seal). Leland, however, did not testify at trial.

20

Petitioner has not previously asserted that he was incompetent at the time of trial or that his attorneys ignored any alleged medical or mental health issues. Claims that could have been raised on direct appeal cannot be presented on collateral review under 28 U.S.C. §2255. An error that might have justified reversal on direct appeal will not necessarily support a collateral attack on a final judgment. *See United States v. Frady*, 456 U.S. 152, 165 (1982); *Grant v. United States*, 72 F.3d 503, 505 (6th Cir. 1996). Petitioner must show "cause" for a failure to earlier raise the issue, as well as "actual prejudice." *United States v. Frady, supra*, 456 U.S. at 167-68; *Napier v. United States*, 159 F.3d 956, 961 (6th Cir. 1998).

As cause for this procedural default, petitioner asserts the alleged ineffective assistance of counsel. *See Traverse.* Attorney error may constitute cause sufficient to excuse a procedural default if it amounts to ineffective assistance of counsel under the test set forth in *Strickland, supra. Edwards v. Carpenter*, 529 U.S. 466, 471 (2000), citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). Petitioner has not shown that his trial counsel was ineffective for not raising a defense based on petitioner's claimed mental health issues. It follows that appellate counsel was not ineffective by failing to claim ineffective assistance of trial counsel based on the failure to raise this defense. Thus, petitioner has failed to show cause for the procedural default. Furthermore, petitioner has not shown prejudice as a result of the procedural default.

The record shows that, prior to trial, defense counsel filed an *ex parte* application for authority to employ Henry Leland, Ph.D., to perform a psychological assessment of petitioner in order to determine if there were grounds to introduce expert testimony relating to a mental disease or defect or any other mental condition that would bear upon the issue of guilt. *See* Doc.

21

#454 (filed under seal).  On May 17, 1997, the Court granted the request. *Id.*[3]  Nothing in

Leland's report indicates that petitioner was incompetent. *See* Doc. #443 (filed under seal).

According to Leland, petitioner exhibited the following diagnostic impression:

> I. Gender Identity Disorder with Transvestite Fetishism (DSM IV 302.85) and Bi-Sexuality.
>
> II. Schizo typal Personality Disorder with antisocial Characteristics and refusal to abide by social norms.

*See id.*  Petitioner was also seen by Charles Spinazola, Ph.D., from June 29, 1998, to December

2, 1998.  *See* Exhibit 1 to *Second Motion of Defendant for Custody for Care or Treatment in a*

*Suitable Facility,* Doc. #479.  Nothing in Spinazola's reports supports any of petitioner's

allegations.  *Id.* Defense counsel twice requested that petitioner be housed in a treatment facility

rather than prison, but those requests were denied.  *See* Docs. #441, 479.  Counsel filed twenty-

three objections to the Pre-Sentence Investigation Report, including an objection to the Court's

refusal to grant his motion for housing in a treatment facility, and a motion for downward

departure based upon petitioner's alleged vulnerability in prison due to his gender identity

disorder.  *See Motion for Downward Departure,* Doc. #483 at 12, 18.  Neither petitioner nor

defense counsel ever even suggested that petitioner was unable to understand the proceedings, or

was under the influence of drugs that adversely affected his ability to understand and participate

in the proceedings, nor does the record support such claims. The Court noted as follows in

denying petitioner's October 9, 1997, motion for treatment in a suitable facility:

> The Court accepts the fact that, according to Dr. Leland's report, the defendant does have the mental disorders described in Dr.

---

[3] Although petitioner now discounts Leland's report on the basis that Leland was unqualified, nothing in the record before this Court indicates that Leland's report was inaccurate or that Leland was unqualified.

Leland's report.... The former [*i.e.,* gender identity disorders], was amply demonstrated at trial not only by photographs offered by defendant but by the testimony of witnesses called by the defendant. The latter [*i.e.,* schizoid personality disorder with antisocial characteristics] is supported by the criminal conduct of which the defendant has been convicted. There is nothing in Dr. Leland's report or in any other matters brought to the Court's attention, however, that would indicate that defendant is in need of some special treatment for his mental problems over and beyond what can be provided by the Bureau of Prisons in the confines of a federal prison.

***

At the conference with counsel on November 20, 1997, defense counsel represented to the Court that, based upon [defense counsel] Mr. Alden's observations of defendant, defendant's mental and emotional state appears to be deteriorating and any suicidal tendencies appear to have become more pronounced. The Court recalls that in May, 1996, in support of the *ex parte* application for the employment of Dr. Leland, Mr. Alden at that time referred to Mr. Langan having had "some suicidal thoughts." Dr. Leland makes no mention of this in his report, and the matter has not been brought to the attention of the Court in the year and one-half since the application was made. The Court, however, accepts counsel's representation that defendant's suicidal thoughts have either persisted or resurfaced.... [and] on November 20, 1997, so informed the United States Marshal and requested that appropriate security measures be taken immediately to provide for defendant's custodial safety.

Also during the conference on November 20, 1997, defense counsel asserted for the first time, as another basis for the pending motion, 18 U.S.C. §3552. This statute authorizes a sentencing court to order "a study of the defendant" by qualified consultants in the local community or by the Bureau of Prisons if the court... "desires more information than is otherwise available to it as a basis for determining the sentence to be imposed on a defendant." 18 U.S.C. §3552(b)....

In considering the need for an additional psychiatric or psychological examination of the defendant, it is very important to note that there has been no claim made that the defendant is mentally incompetent, and this was reaffirmed during the

23

> November 20, 1997, conference with counsel. The Court, through
> its long association with this case, including two protracted trials
> and numerous hearings, has had occasion to personally observe
> and to engage in colloquies with Mr. Langan and is satisfied that
> the defendant has exhibited no signs whatever of being mentally
> incompetent. The Court has been made aware of defendant's
> personality disorders, both through Dr. Leland's report and the
> evidence defendant presented at trial, and believes that a second
> psychological examination would add little or nothing of value to
> what is already known....

Doc. #454 (filed under seal)(citation and footnote omitted). Petitioner's allegation of ineffective

assistance of counsel due to his attorney's failure to raise the issue of incompetence, failure to

seek medical treatment, or failure to properly raise the issue of petitioner's mental health is

without merit.

Petitioner also asserts that he was denied the effective assistance of counsel because his

attorney failed to prevent the government from destroying exculpatory evidence. *Petition*, at 5.

Although petitioner fails to indicate in his petition the nature of any evidence that was allegedly

improperly destroyed, in his *Traverse*, he alleges that ballistic material was destroyed, that the

van in which he was arrested was improperly disassembled so as to destroy potential forensic

evidence, and that evidence in related cases was destroyed without proper notice to petitioner,

including evidence of "hoax destructive devices." *Traverse*, at 35. Petitioner also alleges that

> respondent failed to apprehend suspects in this case once it
> identified them, and choose [sic] to follow them instead, giving
> them the chance [to destroy] much evidence, which they did.

*Id*., at 36. Petitioner has failed to provide any further specificity regarding these allegations. He

also fails to indicate in what manner his attorneys could have prevented the alleged destruction

of such evidence. His allegations are completely without merit. Further, he has failed to

establish prejudice under the second prong of *Strickland:*

24

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.

*** 

Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.... Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense.

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.

*** 

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt....

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. ... [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland,* 466 U.S. at 691-96 (citations omitted).  Petitioner has failed to meet this standard here.

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to prevent the government from losing or destroying a bullet that was removed

25

from his back shortly after his arrest. *Petition*, at 10. However, the record fails to reflect that the bullet was lost or destroyed due to any deficiency on the part of defense counsel. Additionally, petitioner has failed to establish in what manner he was prejudiced under the test set forth in *Strickland* due to the alleged unavailability of this bullet.

Dr. John Drstvensek examined petitioner at the emergency room on January 18, 1996, and testified regarding petitioner's back injury. Drstvensek was subject to extensive cross-examination by defense counsel. Defense witness Dr. Vincent Spagna, medical director of the Franklin County Jail, examined petitioner on January 20, 1996, February 5, 1996, and February 12, 1996. Spagna also testified regarding petitioner's back injury.

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to obtain a medical exam to prove that he sustained a bullet wound the day of his arrest. However, nothing in the record supports petitioner's allegation that any expert witness would have testified that the bullet injury that he undoubtedly sustained was new.

Drstvensek stated:

> What we found was a superficial abrasion on the right posterior chest area.... I looked at the wound, it was a very superficial abrasion, kind of like a kid falls off a bike and scuffs themselves and just tears a superficial lining of skin off.
>
> And several, maybe a half inch or so away from that was a palpable lump, like a foreign body.... And on the chest x-rays, there was a metal fragment that looked like a bullet.
>
> ... [T]here was a bullet, a metal fragment in his chest that he wanted to know if it happened today. And I probed the wound and there was no connection of a superficial wound as a bullet track would be.
>
>                             \*\*\*
>
> [Petitioner] wanted to know if it was new, but he had also been

26

shot before and he said it could be old, but he wanted to be 100 percent sure that it was not a new wound.

We were confident, myself and the other surgeons present, that it was an old injury.

*** 

... But he persisted, and so to be 100 percent sure what we did was under local anesthesia... we made a small incision, and then with some difficulty pulled out this foreign body. And at that point we knew it was an old projectile because --

*** 

Because it was encased in a dense fibrotic scar tissue. And a new wound would not have scar tissue. Scar tissue takes weeks or months.... It confirmed that it was an old bullet.

*Transcript XII*, at 18-20.  *See also Transcript*, XV, July 26, 1996, at 6-26.[4]

Defense witness Spagna stated that petitioner's back injury was "consistent with any traumatic injury to the thoracic area, back area."  *Transcript*, XV, September 25, 1997, at 23. Spagna had removed fibers from petitioner's bullet wound.  Spagna said, "the usual cause [for fibers in a wound]... was some type of external force applied against clothing the individual would be wearing and then that cloth would actually be forcibly introduced under the skin such as you would have, say, in a motorcycle accident."  *Id*., at 25.

Petitioner has failed to establish the ineffective assistance of counsel under *Strickland* due to his attorney's failure to obtain an expert witness to testify that petitioner's back wound was sustained on the day of his arrest.

Petitioner also asserts that he was denied the effective assistance of counsel because his

_____

[4] Petitioner argues that Drstvensek lied.  *Traverse*, at 37.  Nothing in the record supports this argument.

27

attorney failed to make timely use of audiotape expert Mr. Pellicano.  Petitioner states that, after

trial, Pellicano told petitioner that

> much more information could have been extracted that would have
> identified the position of each weapon, the order that the weapons
> were fired, and other critical information favorable to the
> defendant.

*Petition*, at 6.  Again, petitioner's allegation is completely without support.

Bruce Koenig, a consultant with the F.B.I. engineering research facility at Quantico,

Virginia, was called as a joint witness to testify regarding his examination of the audiotape made

by F.B.I. agents at the time of petitioner's arrest.  *Transcript* XVIII, at 31-118.  Koenig said that

the audiotape had been stopped and restarted in the first minute and 8 seconds of the tape, *id.*, at

64-65, 99-100, but that once a voice was heard indicating that petitioner was walking toward his

van, the tape was continuous and unaltered.  *Id.*, at 99.  Koenig said it was not always "doable"

to reconstruct events from an audiotape. *Id.*, at 94.

> [T]he research is showing more and more that unless you can very
> exactly place the shooters, the tape recorders and everything else,
> even small differences, that could be a factor.  So normally, the
> only time we can do it would be like, for instance, if you have a
> video of it and you can really place the people at the scene.... But,
> no, re-enactments are problematic, they rarely produce the results
> that are helpful to you unless you have very, very tight control:
> where the shooter is, where the microphone is located and the
> general direction of the firearm.

*Id.*, at 94-95.  Nothing in the record supports petitioner's allegation that Pellicano could have

assisted petitioner's defense, or added any useful information not already presented by Koenig.

Petitioner has failed to establish the ineffective assistance of counsel under *Strickland* due to his

attorneys' failure to call Pellicano as a defense witness.

Petitioner asserts that defense counsel failed to properly impeach government witnesses

28

because counsel failed to elicit

> the fact that Richard Guthrie had shot his own brother Nick
> Guthrie in a fit of rage, that the wife of Sean Kenney [sic] was
> seeking a reward for information provided to the government,
> [and] that Richard Guthrie had a history of stalking and assaulting
> his associates as well as his enemies.

*Petition*, at 6.

Guthrie committed suicide in 1996, prior to the trials in this case. Although some of

Guthrie's statements nonetheless were admitted against petitioner at trial, *see* discussion, *infra*,

defense counsel was unable to cross-examine Guthrie.

Shawn Kenny,[5] a former skinhead and member of white supremacy organizations, did

testify against petitioner, pursuant to an agreement with the government granting him immunity.

*Transcript*, January 14, 1997, at 19-20. Kenny said that he met petitioner in 1991 at a Christian

Identity church in northern Kentucky. *Id.*, at 20. Petitioner also attended Aryan Nations

meetings at Kenny's house. *Id.*, at 21-22. From 1991 to 1992, petitioner lived in Cincinnati,

Ohio. *Id.*, at 22. Petitioner gave Kenny "The Silent Brotherhood" and "Vigilantes of

Christendom," books that described how to rob banks to finance the right wing cause against the

government. *Id.*, at 27-28. Kenny and petitioner met periodically and discussed how they could

similarly rob banks to finance their right-wing cause. *Id.* Petitioner introduced Kenny to

Richard Guthrie, who joined in these discussions. *Id.*, at 29. From late 1992 to early fall of

1993, during which time petitioner remained "underground," Kenny and Guthrie prepared to rob

a bank in Springdale, Ohio. *Id.*, 34, 36. Petitioner returned in fall of 1993, and the group

---

[5] The transcript refers to "Shawn Kenny;" however, respondent refers to "Shawn Kenney"or "Shawn Kinney."

discussed their plans to rob the Springdale bank together.  *Id.*, at 35-36.  Later, petitioner,

Guthrie and Kenny proceeded to carry out the Springdale bank robbery but, for reasons not

explained, they did not rob the bank at that time.  *Id.*, at 38.  However, at that time, they carried

guns, disguises, a police scanner and a "mockup of an explosive device."  *Id.*, at 38-41.  They

wore bullet-proof vests.  *Id.*, at 42.  Kenny said that he did not participate in the later June 4,

1994, Springdale bank robbery at issue here.  *Id.*, at 48.  However, Kenny met with Guthrie in

June of 1994, at which time Guthrie paid Kenny $200.00 in red-dye-stained money to

compensate Kenny for his participation in planning the Springdale bank robbery.  *Id.*, at 62.

According to Kenny, Guthrie was upset that the dye pack had exploded during the Springdale

bank robbery; Guthrie said that he had lost his police radio scanner during the robbery.  Guthrie

also told Kenny that Guthrie and petitioner had robbed the Springdale bank as they had planned.

*Id.*, at 68.  Guthrie said petitioner vaulted behind the counter of the bank during the robbery.  *Id.*,

at 68, 70.

      Guthrie's statements were admitted pursuant to Rule 801(d)(2)(E) of the Federal Rules of

Evidence, which provides in relevant part:

> (d) Statements which are not hearsay. A statement
> is not hearsay if--
> (2) Admission by party-opponent. The statement is
> offered against a party and is .... (E) a statement by
> a coconspirator of a party during the course and in
> furtherance of the conspiracy.

      Guthrie's statements regarding the Springdale robbery were properly in evidence, and

even if petitioner's allegations about Guthrie having shot his brother, at some unknown time, in a

fit of rage and that Guthrie "had a history of stalking and assaulting his associates as well as his

enemies" are true, the District Court would have excluded evidence regarding these alleged

30

events under Rule 608 of the Federal Rules of Evidence.[6]  Defense counsel was not ineffective

for not attempting to present such evidence.

Petitioner also asserts that his attorneys improperly failed to cross-examine Shawn Kenny

regarding his wife's attempt to collect reward money from the FBI for information she had

provided to the government in this case:[7]

> Petitioner told counsel early on that it was very, very likely that the
> Kenney's [sic] were motivated by reward money offered in this
> case. The authorities involved in this case... had offered rewards
> before this petitioner was ever a suspect. Tabatha Kenney [sic]
> implicated her own husband in a[n] armored car robbery that took
> place in the eastern suburbs of Cincinnati, Ohio, in the fall of

---

[6]  Federal Rule of Evidence 608 provides:

 (a) Opinion and reputation evidence of character. The credibility of a witness
may be attacked or supported by evidence in the form of opinion or reputation,
but subject to these limitations: (1) the evidence may refer only to character for
truthfulness or untruthfulness, and (2) evidence of truthful character is admissible
only after the character of the witness for truthfulness has been attacked by
opinion or reputation evidence or otherwise.

(b) Specific instances of conduct. Specific instances of the conduct of a witness,
for the purpose of attacking or supporting the witness' character for truthfulness,
other than conviction of crime as provided in rule 609, may not be proved by
extrinsic evidence. They may, however, in the discretion of the court, if probative
of truthfulness or untruthfulness, be inquired into on cross-examination of the
witness (1) concerning the witness' character for truthfulness or untruthfulness, or
(2) concerning the character for truthfulness or untruthfulness of another witness
as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not
operate as a waiver of the accused's or the witness' privilege against
self-incrimination when examined with respect to matters that relate only to
character for truthfulness.

[7]  Tabatha Kenny, Shawn Kenny's wife, did not testify against petitioner at trial.  Thus, it
is not apparent to the Court how discrediting her alone would have worked to petitioner's benefit
at his trials.

> 1993.... It is clear the Kenney's [sic] expected and sought rewards
> and were even willing to cross each other to get them. The
> petitioner does not take the respondent's bland and self-serving
> assertion that Tabatha Kenney or Sean Kenney were not seeking
> rewards, they were, yet counsel never pointed this out.

*Traverse*, at 40.  The record fails to reflect that Shawn Kenny's wife, Tabatha Kenny, sought

reward money from the F.B.I. prior to or during petitioner's trials or that the government was

aware of any efforts by Tabatha to obtain reward money during this time.  Respondent indicates

that the F.B.I. paid Tabatha $5,000.00 after petitioner was convicted, *see Return of Writ*, at 100;

however, the record does not reflect that counsel's performance was constitutionally inadequate

for failing to acquire such information.

On July 26, 1996, pursuant to petitioner's request for the names of confidential

informants (which request was denied, Doc. #118), the government disclosed "all memoranda

and notes relevant to confidential informant, Tabatha Kenny" for the Court's *in camera* review.

Docs. #131; 484, at 13; Doc. #460, Exhibits 18 and 19 (filed under seal). Nothing contained

therein indicates that Tabitha Kenny sought reward money prior to or during petitioner's trials:

> [T]he Cincinnati Police Department received information from a
> person, they identified as a confidential source, during their
> investigation of the Society Bank robbery in Springdale, Ohio in
> 1994.
>
> This witness is a woman by the name of Tabitha Kinney [sic].[8]
> She is the wife of a man by the name of Shawn Kinney [sic] who
> will be called as a witness at trial.  She related to the officers that
> she suspected that Richard Guthrie and Peter Langan committed
> the Society Bank robbery.  She also suspected that her husband
> was involved or had knowledge of the robbery.  The source of her
> information was her husband, Shawn.  She did not claim to have

---

[8] As with Shawn Kenny, Tabatha Kenny's name is spelled in a variety of ways
throughout the record.

been involved in the robbery or have personal knowledge of the
robbery.  Prior to the Society Bank robbery, Tabitha Kinney also
advised law enforcement authorities that Richard Guthrie and Peter
Langan had been involved in an armored car robbery in Cincinnati,
Ohio....

... At most, she is a tipster and the United States does not believe
that her identity need be turned over to the defense.

*See Government's in Camera Submission Concerning Confidential Informants,* Doc. #460 (filed

under seal).  A December 28, 1995, interview of Tabatha Kenny by the F.B.I. indicates in

relevant part as follows:

Based in part upon Shawn Kenny's relationship with Langan and
Guthrie, during December, 1993, [Tabatha Kenny] served her
husband with divorce papers, and along with her two children
Corey and Logan Kenny, moved out of their residence.
Approximately four months later, and before the divorce was
finalized, Shawn Kenny returned to her and stated that he would
no longer associate with Langan or Guthrie.  To her knowledge,
Shawn Kenny has had no further contact with either Langan or
Guthrie since April, 1994.

During December, 1993 she recalled seeing a television broadcast
in which two white males were depicted as being involved in some
robberies around the Cincinnati area.  Tabatha Kenny contacted
the local Crime Stoppers hot line and provided the names of
Langan and Guthrie which resulted in her being personally
contacted by an Officer Moning..., Cincinnati Police Department
(CPD) and Special Agent Wright..., Federal Bureau of
Investigation (FBI).  During November, 1994, she recalled seeing
an "Unsolved Mysteries" broadcast in which two white males were
depicted as being involved in a series of bank robberies throughout
the midwestern United States.  Based upon the broadcast, Tabatha
Kenny believed the two white males were in fact Langan and
Guthrie.  She later spoke with Shawn Kenny, who also viewed the
same broadcast, and was told by him that he too believed the white
males were Langan and Guthrie.

*Id.*

Even assuming that Tabatha was seeking or paid reward money prior to or during trial,

and that defense counsel's performance was constitutionally inadequate for failing to cross-examine Shawn Kenny regarding this fact, petitioner has failed to establish prejudice from counsel's failure. Shawn Kenny was cross-examined at length regarding his philosophical (white supremacist) beliefs and his motive for testifying against petitioner in this case, *i.e.*, the fact that he was testifying pursuant to a grant of immunity for any of his criminal activity. *See Transcript*, January 14, 1997, at 79-156. Kenny admitted that he was testifying against petitioner in order to avoid jail. The total speculation that Kenny conceivably might benefit from some portion of reward money paid to his wife after the trials for her assistance to the F.B.I. would have done little, if anything, to further discredit him in the eyes of the jury.

Petitioner asserts that he was denied the effective assistance of counsel because his attorneys suffered a conflict of interest, because "[t]he longer and more vigorously counsel defended," the more money they lost. *Petition*, at 6.

> Also the counsel had an improper relationship with the U.S. Marshals at times during trial, giving them home baked food (Kevin Durkin). Counsel was [sic] also worried about their future ability to practice law in the Southern District of Ohio due to the animosity this case was generating between the U.S. Attorney's office and counsel. This also caused counsel to be less vigorous in stopping abuses of the defendant's rights in regard to a fair trial and government misconduct. This fact is also supported by the withdrawal of Kevin Durkin after the end of the second trial so that he could get paid for his services rather than wait [un]til after the defendant was sentenced.

*Id.* Petitioner further asserts that

> [a] conflict of interest arose when Mr. Alden became a legal partner with Mr. Durkin and could not critically examine Mr. Durkin's conduct as defense counsel. The possible conflict was not presented to the defendant until after the fact[,] and influenced the defendant's decision to have Mr. Alden withdraw as [] appellate counsel.

*Id.*

Where the defendant demonstrates that an actual conflict of interest adversely affected his attorney's performance, prejudice is presumed.  *Strickland, supra,* 466 U.S. at 692, citing *Cuyler v. Sullivan,* 446 U.S. 335, 345-50 (1980).

> In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, *see, e.g.*, Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan, supra,* 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

*Id.*  Petitioner must demonstrate "a real or genuine, as opposed to hypothetical, conflict of interest" in order to establish an actual conflict of interest.  *See Moss v. United States*, 322 F.3d 445, 467 n.23 (6th Cir. 2003), citing *Mickens v. Taylor*, 122 S.Ct. 1237 (2002).

> The standard for determining whether an actual conflict of interest exists was set forth in *United States v. Mers,* 701 F.2d 1321 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983), as follows:
>
> > We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." ... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such

35

> as eliciting (or failing to elicit) evidence helpful to
> one client but harmful to the other. If he did not
> make such a choice, the conflict remained
> hypothetical." ... There is no violation where the
> conflict is "irrelevant or merely hypothetical"; there
> must be an "actual significant conflict." Id. at 1328
> (citations omitted).

*Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987)(footnote omitted).

Petitioner has failed to meet this standard here. Petitioner's allegation that his attorneys "worried about the[ir] future ability to practice law in the Southern District of Ohio," and that an "improper relationship" existed between the U.S. Marshals and defense counsel finds no support in the record. Further, even assuming that defense attorney Durkin gave home baked goods to U.S. Marshals during trial, such fact would not establish an improper conflict of interest. Petitioner offers no evidence that shows that defense counsel's performance was compromised due to any alleged conflict of interest. Moreover, the fact that attorney Durkin withdrew from the case immediately prior to petitioner's sentencing hearing also does not signify that this attorney suffered a conflict of interest. Petitioner was represented by two attorneys throughout his trials; co-counsel Alden remained as defense counsel at petitioner's sentencing hearing. On appeal, petitioner was represented by new counsel who could have, presumably raised any issue regarding the trial performance of attorney Durkin, if appellate counsel considered such claims to be colorable. Therefore, petitioner has failed to establish a conflict of interest due to Alden's alleged inability to raise on appeal the issue of ineffective assistance of trial counsel as to attorney Durkin.

Petitioner also asserts that he was denied the effective assistance of trial counsel because his attorneys failed to return legal papers, thereby depriving petitioner of the ability to assist in

36

the preparation of his defense.  Yet, according to petitioner, the documents at issue were not

denied to petitioner until after he had been convicted and sentenced:

> From day one... petitioner has demanded, expected, and received a
> copy of every document that was ever generated in this case.  OR
> to better qualify that statement the petitioner did ask for that.  The
> petitioner did receive a great amount of it....  These papers were
> used by the petitioner in assisting counsel in this case.  When the
> petitioner was moved from Pickaway County, to Franklin County,
> those papers followed, when the petitioner went from Franklin
> County, to the Federal Detention Center in Milan, Michigan, they
> were brought along by the U.S. Marshals transporting the
> petitioner.  At this point they were hijacked....

*Traverse*, at 43.  Additionally, a letter from attorney Alden dated December 30, 1999, indicates

that Alden sent petitioner's legal material to Mark Pickrell, petitioner's appellate counsel, at

Pickrell's request, so that Pickrell could prepare petitioner's appeal.  *See* Exhibit S4-3, attached

to *Petitioner's Fourth Supplemental Motion*.  The facts alleged by petitioner in this regard

simply do not constitute the ineffective assistance of counsel under the test set forth in

*Strickland.*[9]


Petitioner argues generally that he was denied the effective assistance of trial counsel

because his attorneys were hostile towards him, degraded him, were overwhelmed by the task of

representing him, and intimidated by the government.  Again, these allegations find no support

in the record.  Petitioner simply has failed to establish the ineffective assistance of counsel under

*Strickland.*

---

[9]  To the extent that petitioner asserts that his appellate attorney, Mark Pickrell,
improperly failed to return legal papers, such claim will be addressed along with petitioner's
other allegations of ineffective assistance of appellate counsel. *See discussion*, claim two, *infra*.

Petitioner also asserts, in his memorandum in support of claim one, that he was denied the effective assistance of trial counsel because his attorneys failed to file a motion *in limine* to prevent the jury from viewing a "highly prejudicial video," failed to redact prejudicial portions of that videotape, and failed to object to references therein regarding petitioner's assertion of his right to counsel. Again, petitioner fails to provide any specificity regarding these allegations. The Court presumes that petitioner's complaints refer to "The Armed Struggle Underground," a videotape made by petitioner, Scott Stedeford, Richard Guthrie, and Kevin McCarthy in January to March 1995, and played for the jury at petitioner's assault trial. *Transcript*, A-IX, September 17, 1997, at 68-71. The tape depicted petitioner and his associates expressing their white supremacist beliefs and espousing the goals of the Aryan Republican Army.

The following interchange took place between defense counsel and the Court at the time the videotape was played:

> [Defense counsel]: Your Honor, the tape is relevant. I think taken as a whole, though, it does have some probative value. I think the possibility though of unfair prejudice, taking the tape as whole, I think outweighs the probative value. But I mean it is obviously relevant and it is certainly proper for the purpose that the government is offering it.
>
> COURT: The Court also believes that it is relevant and of course I have considered, as I should, the balancing required under Rule 403. I think that the tape has strong probative value in terms of establishing the defendant's alleged attitude toward the federal government and his intention with regard to the events that occurred on January 18, 1996. It supports the government's position regarding the groups' alleged commitment to violence and possession of firearms, tends to support the government's position regarding the finding of the bomb-making materials at 585 Reinhard and the defendant's possession of the pipe bomb and weapons found in the van.
>
> It has strong probative value and I also have to consider that,

38

> however, against the question of whether that probative value is
> substantially outweighed by the danger of unfair prejudice. And in
> considering that, I feel that probative value is not substantially
> outweighed by the danger of unfair prejudice.
>
> The jury has already been told considerable [sic] at least regarding
> the existence of this tape and the Aryan Republican Army in the
> opening statement of the defendant. I would agree that it's
> relevant. And applying the balancing factors under 403, I feel that
> the probative value is not substantially outweighed by the danger
> of unfair prejudice.

*Id.*, at 72-73. Prior to showing the videotape, the Court instructed the jury as follows:

> Ladies and gentlemen of the jury, the videotape recording you are
> about to see and hear is admitted in evidence for a limited purpose
> as evidence offered by the government on the ground that it is
> relevant to the issue of the defendant's state of mind at the time of
> his arrest on January 18, 1996.
>
> As with any other evidence, you may give it such weight as you
> find it should have. I do caution you that you may see and hear
> things concerning racial and religious views that you may find
> personally offensive. The defendant, however, is not on trial for
> any such views and they are not to be considered as evidence of his
> guilt or innocence on the specific charges of the indictment for
> which the defendant is now on trial.
>
> Furthermore, although there has been evidence received of
> defendant's involvement in bank robberies, I remind you that the
> defendant is not on trial for any offenses of that nature.

*Id.*, at 83-84. The record therefore establishes that petitioner's counsel effectively challenged the

admissibility of the videotape into evidence. The fact that the challenge was ultimately

unsuccessful does not alone render their representation of petitioner constitutionally inadequate.

Further, petitioner has failed to specify what portions of the videotape should have been redacted

but were not. In any event, the jury had already been exposed to petitioner's white supremacist

views and the fact that he advocated the overthrow of the United States government through the

use of violence. *See, e.g., Transcript*, A-I, September 2, 1997, at 71-73;77-78. Based upon all of the foregoing, this Court concludes that petitioner has failed to establish the ineffective assistance of counsel due to his attorney's failure to object to admission of the videotape.

This Court personally observed the performance of two extremely well-qualified, well-prepared, and dedicated criminal defense attorneys effectively representing a defendant in a very difficult case.

Claim one is without merit.

## IV. CLAIM TWO - INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his second claim for relief, petitioner asserts the ineffective assistance of appellate counsel. The *Strickland* test also applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

Petitioner first asserts that he was denied the effective assistance of appellate counsel because one of his trial attorneys, Randolph Alden, joined the law firm of the other trial attorney, Kevin Durkin. Trial counsel Alden was initially appointed to represent petitioner on appeal. *United States v. Langan,* Case No. 99-3146, *Order* (6th Cir. June 25, 1999). Petitioner contends that Alden was inaccessible and ignored him. On October 13, 1999, and before petitioner's appellate brief was filed, the Court of Appeals granted Alden's motion for leave to withdraw. *Id., Order* (October 13, 1999). Spiros Cocoves was appointed by the Court of Appeals on

40

October 23, 1999, *id.,* but he moved to withdraw shortly thereafter. That motion was granted by

the Court of Appeals on November 30, 1999. *Id., Order*, (November 30, 1999). Petitioner

complains that attorney Cocoves refused to accept petitioner's collect calls. On December 3,

1999, the Court of Appeals appointed C. Mark Pickrell to represent petitioner on appeal, *id.,*

*Letter* (December 3, 1999), and it was he who actually ordered the trial transcript and filed

appellate briefs on behalf of petitioner.[10] Since neither Alden nor Cocoves actually represented

petitioner on appeal, petitioner has failed to demonstrate the ineffective assistance of appellate

counsel under *Strickland* based upon their performance.

Petitioner asserts that he was denied the effective assistance of appellate counsel because

his attorney, C. Mark Pickrell, was "very unreachable" and "failed to respond to letters."

*Petition*, at 8.

> Mr. Pickrell failed to send the defendant copies of filings in this
> case. Or if he did send anything it was not in a timely or
> professional fashion. Mr. Pickrell refused to follow the proper
> procedure for legal mail when he did bother to send the defendant
> something. Which [sic] resulted in the constant opening of the
> defendant's legal mail without the defendant being present. This
> violated the... right of the attorney client privilege and
> confidentiality [w]hich had a chilling effect upon the defendant
> who felt... [that] any communication between counsel and client
> was seen by the very people who were trying to keep the defendant
> in prison and convicted.

*Id*. Additionally, petitioner asserts that he was denied the effective assistance of appellate

---

[10]This was despite petitioner's repeated *pro se* requests to the Court of Appeals for the
appointment of replacement counsel. These requests were denied. *Id., Order* (March 28, 2000);
*Order* (May 15, 2000). Moreover, the Court of Appeals expressly stated that "[t]he court will
not entertain motions from the defendant for replacement counsel on the grounds that counsel
will not raise issues that the appellant wishes to raise or counsel will not satisfy his burdensome
requests for copies." *Id., Order* (May 15, 2000).

counsel because Mr. Pickrell failed to confer with him in a meaningful way regarding issues to

be raised on direct appeal, failed to raise on appeal any issues related to petitioner's assault trial,

failed to file a brief pursuant to the United States Supreme Court's decision in *Anders v.*

*California*, 386 U.S. 738 (1967),  failed to file a motion for rehearing with the United States

Court of Appeals for the Sixth Circuit or a petition for a writ of *certiorari* to the United States

Supreme Court despite advising petitioner that he would do so, failed to send petitioner a copy of

the appellate court's decision, failed to return legal papers to petitioner, and failed to assert "

numerous valid issues on appeal." *Petition*, at 9.  All of these claims are without merit.

There is no constitutional right to counsel in pursuing a petition for a writ of *certiorari* in

the United States Supreme Court or in seeking a discretionary rehearing *en banc* by the United

States Court of Appeals for the Sixth Circuit.  *McNeal v. United States*, 54 F.3d 776,

unpublished, (6th Cir. May 11, 1995), citing *Wainwright v. Torna*, 455 U.S. 586, 587 (1982) and

*Ross v. Moffit*, 417 U.S. 600 (1974).  Thus, petitioner cannot establish the ineffective assistance

of his appellate counsel by reason of his attorney's failure to seek discretionary review with the

United States Supreme Court, or with the United States Court of Appeals for the Sixth Circuit.

Petitioner also complains that his appellate counsel failed to file an "*Anders* brief."  In

*Anders v. California*, *supra*, 386 U.S. at 738, the United States Supreme Court held:

> [I]f counsel finds his case to be wholly frivolous, after a
> conscientious examination of it, he should so advise the court and
> request permission to withdraw.  That request must, however, be
> accompanied by a brief referring to anything in the record that
> might arguably support the appeal.  A copy of counsel's brief
> should be furnished the indigent and time allowed him to raise any
> points that he chooses; the court--not counsel--then proceeds, after
> a full examination of all the proceedings, to decide whether the
> case is wholly frivolous.  If it so finds it may grant counsel's
> request to withdraw and dismiss the appeal insofar as federal

> requirements are concerned, or proceed to a decision on the merits,
> if state law so requires.  On the other hand, if it finds any of the
> legal points arguable on their merits (and therefore not frivolous) it
> must, prior to decision, afford the indigent the assistance of
> counsel to argue the appeal.

*Id*., at 744.  Such were not the circumstances here.  The fact that the United States Court of

Appeals for the Sixth Circuit eventually denied petitioner's appeal does not reflect that appellate

counsel was inadequate.  Petitioner has failed to identify any colorable issues that should have

been but were not raised on appeal.[11]  Petitioner has likewise failed to establish prejudice under

---

[11]  In his traverse, petitioner lists twenty-nine potential issues for appeal, and states that he previously identified for appellate counsel 65 potential issues for appeal.  *Traverse,* at 49-50.  Petitioner complains that his attorney raised too few issues on appeal.  *Id*.  However, the quantity of issues presented on direct appeal does not constitute the constitutional standard by which to measure the adequacy of appellate counsel's performance.  *See Smith v. Murray, supra*, 477 U.S. at 536 (citation omitted).  Further, and contrary to petitioner's contention, simply because  his trials were lengthy or complex does not mean that numerous non-frivolous issues existed for appeal.  On March 27, 2000, the Chief Deputy Clerk for the United States Court of Appeals for the Sixth Circuit similarly advised petitioner as follows in a letter regarding the Sixth Circuit's refusal to appoint yet new counsel on appeal:

> You will receive in a separate mailing an order denying your motion for someone else to be appointed to replace Mark Pickrell, whom I note is your third attorney on appeal.  I am writing this letter to remind you that Mr. Pickrell is an attorney, you are not, and his decision not to raise all of the 60-some issues which you like does not make him ineffective.  The court has determined from his past performance that he is quite competent in his representation of criminal defendants - he would not be on the court's roster of attorneys willing to accept CJA appointments if he were incompetent.

> Mr. Pickrell's two predecessors, like him, have demonstrated their competency in criminal defense work time and time again.  Given your unsuccessful relationships with prior counsel and the content of your motion, it suggests that it is your conduct which is unreasonable, not theirs.  That history would be taken into account should you be unable to rehabilitate your relationship with Mr. Pickrell and he moves to withdraw.  In other words, you will have to work with Mr. Pickrell if you want continued representation of any court-appointed attorney on appeal.

43

*Strickland* by reason of his counsels' alleged failure to return legal papers or to send a copy of the appellate court's decision denying his appeal. Finally, petitioner's allegation that his attorney failed to confer with him regarding his appeal is unsupported by the record.

Claim two is without merit.

## V. CLAIM THREE - PROSECUTORIAL MISCONDUCT

In his third claim for relief, petitioner asserts that the government failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner specifically alleges that "[i]t was a pattern and practice of the government in this case to lie, cheat, steal and do anything that would hinder the defendant, and defense counsel. Irregardless [sic] of w[h]ether or not it was illegal, unethical, immoral or otherwise improper." *Petition*, at 10. Petitioner's allegations are without merit.

In *Brady v. Maryland, supra*, the United States Supreme Court held that

> suppression by the prosecution of evidence favorable to an accused
> upon request violates due process where the evidence is material
> either to guilt or to punishment, irrespective of the good faith or
> bad faith of the prosecution.

373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[T]here is never a real "*Brady* violation" unless the nondisclosure

---

If you decide that you want to take over your own representation, that request will
be honored, of course. However, before you decide that that course is desirable, I
will advise you that the clerk's office does not ship district court records to *pro se*
appellants, jailed or not. You may find yourself having to prepare your brief with
minimal resources. I offer this information for your consideration.

*Petitioner's Exhibit C-4-B*, attached to *Traverse*.

> was so serious that there is a reasonable probability that the
> suppressed evidence would have produced a different verdict.

*Strickler v. Greene,* 527 U.S. 263, 281 (1999). "Impeachment evidence, as well as exculpatory

evidence, falls within the *Brady* rule." *O'Guinn v. Dutton*, 88 F.3d 1409, 1418 (6th Cir. 1996),

citing *United States v. Bagley, supra.*

Petitioner first asserts that, at his January 19, 1996, initial appearance, the government

improperly advised the Court that petitioner had shot twice at arresting agents, which fact was

not supported by the evidence. The record indicates that, in the January 19, 1996, complaint

filed against petitioner, Agent David Stout stated that petitioner

> pointed a handgun (seen by both FBI Special Agents Lindsey and
> Erbach) in their direction, and fired. FBI Special Agents Lindsey,
> Erbach and others returned fire. At the conclusion of the gunfire,
> Langan was again ordered out of the van.... At this point Langan
> moved to the front of the van, exited the vehicle, and was placed
> under arrest.

*Complaint,* Doc. #1.[12]  At petitioner's January 22, 1996, detention hearing, however, the

evidence did not establish conclusively that petitioner had fired at law enforcement officers:

> Langan was told to raise his hands and get out of the van. He
> apparently began to cooperate, albeit slowly, but then suddenly
> rolled to his right, dived behind the driver's seat of the van, spun
> toward the approaching agents, and raised both of his arms in a
> manner consistent with pointing a weapon at the agents.
>
> What happened next was the subject of some dispute. Two FBI
> agents have stated that they saw a gun in Langan's hands, but two
> other law enforcement agents, approaching from a different angle,
> saw only his outstretched arms and clasped hands. At least two of
> the agents believed that Langan fired a shot at them, although to
> date there is scant physical evidence suggesting that he did so.

---

[12] Petitioner alleges that Agent Stout lied. *Traverse*, at 52. Petitioner's conclusory
allegation in this regard is without any support.

> Nonetheless, in response to this perceived threat, a number of law
> enforcement agents opened fire, and between 45 and 49 shots were
> eventually fired toward or into Langan's van....

*Detention Order*, Doc. #6. At petitioner's assault trial, the government did not argue that

petitioner actually fired at law enforcement officers. *Transcript*, September 2, 1997, at 36.

Special Agent Jeffrey Lindsey testified that petitioner pointed a silver handgun at Lindsey and

Special Agent Erbach. *Id*., at 181. Defense counsel brought out on cross-examination that there

was little evidence that petitioner's firearm had actually been discharged. *Id.*, September 3,

1997, at 13-14; 45; September 22, 1997, at 40-43. Under these circumstances, even if the

affidavit made in support of the complaint was in error in this regard, that fact alone does not

constitute prosecutorial misconduct or establish a *Brady* violation.

Petitioner again asserts that the government improperly lost or destroyed the bullet

removed from his back on the day of his arrest. In his December 18, 2003, supplemental motion,

petitioner further alleges that respondent was aware at the time of trial that petitioner had never

previously sustained a gunshot injury to his back. "FBI agents at the Grant Hospital Emergency

Room got rid of the bullet... and began fabricating a story about an old bullet wound. They also

recruited Dr. Drstvensyk [sic] possibly by intimidation to go along with the old wound theory.*"*

*Supplemental Motion to Petition*, at 2. Petitioner states that he "needs to be able to examine Dr.

Townsend as he was the one who did actually remove the bullet in question and re-examine Dr.

Drstvensyk ...." *Id*. Again, petitioner's allegations are completely without support in the record

and, beyond his bold allegations, petitioner offers no reasonable basis for believing that support

for his allegations in this regard exists outside the record. For the reasons discussed, *supra*, the

record simply does not support petitioner's allegation that he was shot by law enforcement

officers at the time of his arrest or that the government improperly attempted to conceal any such

information.

The Due Process Clause of the Constitution does not impose

> upon the police an undifferentiated and absolute duty to retain and
> to preserve all material that might be of conceivable evidentiary
> significance in a particular prosecution.

*Arizona v. Youngblood,* 488 U.S. 51, 57 (1988).

> Whatever duty the Constitution imposes on the States to preserve
> evidence, that duty must be limited to evidence that might be
> expected to play a significant role in the suspect's defense.

> To meet this standard of constitutional materiality, *see United
> States v. Agurs*, 427 U.S., at 109-110, evidence must both possess
> an exculpatory value that was apparent before the evidence was
> destroyed, and be of such a nature that the defendant would be
> unable to obtain comparable evidence by other reasonably
> available means.

*California v. Trombetta*, 467 U.S. 479, 488-89 (1984). However,

> [w]hen the state fails to preserve evidentiary material "of which no
> more can be said than that it could have been subjected to tests, the
> results of which might have exonerated the defendant," a defendant
> must show: (1) that the government acted in bad faith in failing to
> preserve the evidence; (2) that the exculpatory value of the
> evidence was apparent before its destruction; and (3) that the
> nature of the evidence was such that the defendant would be
> unable to obtain comparable evidence by other means. [*Arizona v.
> ]Youngblood*, 488 U.S. at 57, 109 S.Ct. 333; *United States v.
> Jobson*, 102 F.3d 214, 218 (6th Cir.1996).

> "The presence or absence of bad faith by the police for purposes of
> the Due Process Clause must necessarily turn on the police's
> knowledge of the exculpatory value of the evidence at the time it
> was lost or destroyed." *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333.

*Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002). Petitioner does not meet this standard.

Nothing in the record indicates that counsel for the government acted in bad faith, nor does it

47

appear that the bullet removed from petitioner's back was of apparent exculpatory value.

Further, since doctors who examined and treated petitioner and who removed the bullet from his

back testified and were available for cross-examination, comparable evidence regarding

petitioner's injury was available despite any loss of the actual bullet. Moreover, presumably,

petitioner's own medical records were also available to him.

> [T]he government's failure to disclose potentially exculpatory information does not violate *Brady* "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information' or where the evidence is available to the defendant from another source." *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)(quoting *United States v. Grossman,* 843 F.2d 78, 85 (2nd Cir. 1988)). *See also Todd*, 920 F.2d at 405.

*United States v. Cottage*, 307 F.3d 494, 499 (6th Cir. 2002).

Petitioner next asserts that the government improperly concealed favorable evidence

regarding Kevin McCarthy and McCarthy's alleged involvement in the Oklahoma City

bombings. Petitioner asserts that the government failed to disclose McCarthy's ties to Elohim

City, Oklahoma, and other individuals, "known and unknown," including Timothy McVeigh,

Andreas Strausmyer, Mark Thomas, and Reverend Miller, who all advocated the use of violence

against the United States government. *Petition*, at 11.

> The government had Kevin McCarthy lie under oath when he stated that he was with the defendant on April 19, 1995, and in Kansas at the time. The government also concealed the ties that Kevin McCarthy had to the murder of an Arkansas gun dealer and his family the Mullers. When Kevin McCarthy was arrested he was in possession of a .45 Glock handgun that was taken from Muller in the murder/robbery. The government concealed from the defendant the depth and nature of an investigation by the government into the possible involvement of Kevin McCarthy and others in the Oklahoma City bombing. And the government did so to bolster its case against the defendant, and to conceal its own

48

> wrongdoing in that matter. To this day, the government is engaged
> in a conspiracy to cover up the true facts of their involvement in
> the Oklahoma City bombing and other related matters.

*Id.* Again, petitioner's allegations are completely unsupported by the record before this Court,

and petitioner has failed to provide any reasonable basis for concluding that support for his

allegations exists outside the record.

Kevin McCarthy testified against petitioner at both trials. *See Transcripts*, September 17,

1997, Vol. IX; January 30, 1997, Vol. XV.[13] McCarthy was incarcerated and had pleaded guilty

to a number of charges, including a charge of armed bank robbery pursuant to a plea agreement

with the government. *Id.* McCarthy had promised to cooperate with the government as a part of

his plea agreement, and was hoping to receive a substantial reduction in his sentence, in part, as a

result of his testimony against petitioner. McCarthy admitted in his testimony that, as part of the

plea agreement, the government had promised to file no additional charges against him arising

out of his involvement in six other bank robberies. *Id.* McCarthy was a former Skinhead and

member of other white supremacist groups. He had moved to Philadelphia to live with Mark

Thomas, leader of the Aryan Nations movement, when he was approximately fifteen years old.

During that time, McCarthy joined the Christian Identity movement (a religious white

supremacist organization), and was trained in the use of weapons. *Id.* McCarthy was later

introduced to Scott Stedeford and Richard Guthrie. *Id.* In late 1994, McCarthy, Stedeford,

Guthrie, Mark Thomas, and petitioner met at a waffle house in Van Buren, Oklahoma.

---

[13] McCarthy's testimony against petitioner was essentially the same in both trials. In the assault trial, the previously discussed "Armed Struggle Underground" videotape was also played for the jury. *Transcript,* September 17, 1997- September 18, 1997, Vols. IX and X, at 69-99; 2-10.

McCarthy also stayed in Elohim City, Oklahoma, a small town where many shared the same religious political beliefs of the Christian Identity movement. At the waffle house meeting, McCarthy testified, petitioner told Stedeford "that [petitioner] had been on a job [*i.e.*, a bank robbery] and they had made a big score." *Id.*, at 19. Petitioner recruited McCarthy to join his terrorist group. *Id.*, at 21-22. Petitioner boasted that he had twelve robberies under his belt. *Id.*, at 21. McCarthy, petitioner, Stedeford, and Guthrie also met at a mall in Joplin, Missouri. *Id.*, at 24. At that time, McCarthy was blindfolded and taken to a "safe house" which he later learned was located in Pittsburg, Kansas. *Id.*, at 25-26. Petitioner told McCarthy that during one bank robbery petitioner had jumped the teller counter and hit his knee, bruising the knee, and causing petitioner's mask to fall off. *Id.*, at 33. In the fall of 1995, McCarthy testified, the group obtained a "safe house" in Columbus, Ohio, *id.*, at 34, rented by Guthrie. *Id.*, at 35. McCarthy and Stedeford paid the rent with "company funds" provided by petitioner. *Id.*, at 36. Guthrie slept on a mattress in the dining room and petitioner slept in the bedroom downstairs. *Id.*, at 40. McCarthy identified hard hats, hand grenades, PVC pipe, *id.*, at 48-49, bullet proof vests, police scanners, masks, gloves, money pouches, and code cards for beepers as items used by the group. *Id.*, at 51-53. McCarthy identified the PVC pipe as an explosive device shown to him by petitioner. Petitioner had explained that when "Bulls-eye" or Red Dot smokeless powder was added to the PVC pipe, it would be ready to use. *Id.*, at 50. McCarthy also identified the "Turner Diaries," "The Silent Brotherhood," and the "Irish Republican Army Handbook" as books read or discussed by the group. *Id.*, at 55-56.

At petitioner's bank robbery trial, McCarthy was cross-examined at length regarding his prior drug use and treatment for drug and alcohol use and psychological problems. *Transcript,*

January 30, 1997, at 59-68. McCarthy was also questioned regarding his white supremacist philosophy, his tattoos displaying his religious political beliefs, *id.*, at 70-72, and his exposure to the Christian Identity philosophy through Mark Thomas and others. McCarthy said he believed the white race was superior to others, that the United States government was not a legitimate authority, that the United States government was corrupt and evil, and "in league with the devil, the Antichrist." *Id.*, at 75-76. McCarthy also stated on cross-examination that the United States courts were corrupt and evil, *id.*, at 76-77, and expressed his belief that the government should be changed "through violent action." *Id.*, at 77. McCarthy was cross-examined about spending time in Elohim City with Mark Thomas. *Id.*, at 88-90. Likewise, at petitioner's assault trial, McCarthy was cross-examined at length regarding his white supremacist beliefs, *Transcript,* September 18, 1997, at 10-12, and the plea agreement that required him to cooperate by testifying against petitioner. McCarthy was also cross-examined at length regarding his possible sentence exposure. *Id.*, at 21-29. McCarthy's religious political beliefs were "drilled into" him by Mark Thomas and others. *Id.*, at 45. The goal of his group was to overthrow the government. *Id.*, at 46. According to McCarthy, Elohim City was a place where people shared similar political religious ideas. *Id.*, at 55.

Thus, contrary to petitioner's allegations, the record before this Court reflects that McCarthy's association with weapons, bombs, and other individuals who advocated the violent overthrow of the United States government and who robbed banks to finance their cause was disclosed to the defense and explored fully at trial, as was McCarthy's contact with Elohim City. Exhibits to Return of Writ. The fact that McCarthy "felt the Oklahoma City bombing was a good thing and that he admired the people who did it" was revealed. Exhibit E to Return of

Writ. Nothing in the record before this Court indicates that McCarthy was involved in a conspiracy to bomb the federal building in Oklahoma City or that the government concealed any such information from the defense. Further, nothing in the record suggests that the government failed to disclose any information regarding McCarthy that would have assisted petitioner in his defense or in his efforts to impeach McCarthy's testimony against him.

Petitioner also asserts that the government concealed McCarthy's connection to the murder of an Arkansas gun dealer named Mueller. In support of this allegation, petitioner asserts that McCarthy owned a Glock handgun taken from Mueller when Mueller was killed. *Petition*, at 11. The record before this Court is without support for this claim.

Respondent indicates that, in 1998, after the conclusion of both of petitioner's trials, "authorities in Arkansas developed a case against members of the Kehoe family for the murder of a gun dealer in Arkansas by the name of Mueller." *Return of Writ*, at 95. On June 3, 1998, the F.B.I. questioned McCarthy regarding his contact with the Kehoes:

> McCarthy advised that he had lived at a Christian Identity compound known as Elohim City, Oklahoma during the summer of 1994. This compound was headed by an individual by the name of ROBERT MILLAR. While living at the compound, he recalled meeting the brothers, CHEVIE and CHEYNE KEHOE, as well as their father, KIRBY KEHOE. The KEHOES visited Elohim City on an irregular basis and always seemed to have guns for sale. McCarthy had no idea of the source of supply for the weapons, but assumed they had been purchased at various gun shows in Oklahoma and other states, whose registration laws were fairly lax. McCarthy assumed that this was their source of supply due to the fact that he had seen the KEHOE brothers at several gun shows.

> \*\*\*

> ... McCarthy recalled that following a successful robbery in West Desmoines, Iowa on March 29, 1995, he returned to Elohim City, Oklahoma for a visit. While there, sometime in the early part of

52

April, he purchased a 45 caliber Glock Pistol, having a serial number of UZ352, from CHEVIE KEHOE, for approximately $600.00. As he recalled, KEHOE just happened to be at the compound during this visit, and the opportunity presented itself for McCarthy to purchase the pistol. McCarthy had been using a 9 mm Strum Ruger during the bank robberies, but felt he needed a more powerful weapon. The 9 mm was subsequently sold to MARK THOMAS for approximately $200.00. After purchasing the 45 caliber Glock pistol, he used it in his last three bank robberies and was eventually arrested in possession of the weapon by the FBI on May 23, 1996.

McCarthy concluded by stating that his only contact with the KEHOES was in Elohim City, Oklahoma. He did not normally socialize or interact with these individuals except when he was interested in the weapons they had. His only knowledge of any criminal activities on their part, is what he has learned from watching television and reading the newspaper.

Exhibit F to Return of Writ.

Again, nothing in the record supports petitioner's allegation that the government withheld information that McCarthy was connected to Mueller's murder, nor is there any reasonable basis for concluding that any support for this claim exists outside the record.

Petitioner asserts that the government:

offered as evidence a 9 mm silver colored Star brand handgun in the defendant's bank robbery case that it knew was not owned by the defendant on the date of the bank robbery that the defendant was accused of. The government knew that the defendant had purchased this handgun some time after the bank in question was robbed (October 1994).

*Petition*, at 11. Again, this allegation is without support.

The government introduced into evidence at petitioner's bank robbery trial a silver handgun found at 585 Reinhard. Witnesses stated that petitioner had used a black or silver gun in the bank robbery *see, e.g., Transcript*, III, January 13, 1997, at 59; *Transcript*, II, January 9,

53

1997, at 87, 105, 121, and the government argued that the gun found at 585 Reinhard matched

the description of the gun used in the CNB robbery.  However, there is absolutely nothing in the

record to indicate that the government had any information indicating that petitioner allegedly

purchased the handgun after the bank robbery in question.  Further, since petitioner admits that

he purchased the gun, again, any failure by the government to disclose such information would

not constitute a *Brady* violation.  If, in fact, what petitioner says is true, he was aware of the

dealer or person from whom he purchased the firearm and the date the transaction took place.

Petitioner "was aware of the essential facts that would enable him to take advantage of the

exculpatory evidence."  *United States v. Todd,* 920 F.2d 399, 405 (6th Cir. 1990)(citations

omitted).

Petitioner also complains that the government improperly concealed Tabatha Kenny's

attempt to obtain reward money from the government for information she had provided

authorities in this case.  Petitioner asserts that "at the time of Sean Kenney's [sic] testimony,

Sean Kenney [sic] had a financial interest in the conviction of the defendant." *Petition,* at 11.

For the reasons stated *supra*, petitioner has failed to establish that such information constituted

material exculpatory evidence within the meaning of *Brady v. Maryland, supra.  See United

States v. Bagley, supra* 473 U.S. 682.

> "There are three components of a true *Brady* violation: The
> evidence at issue must be favorable to the accused, either because
> it is exculpatory or because it is impeaching; that evidence must
> have been suppressed by the [government], either willfully or
> inadvertently; and prejudice must have ensued." *Strickler v.
> Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286
> (1999).  Favorable evidence is material for *Brady* purposes "if
> there is a reasonable probability that, had the evidence been
> disclosed to the defense, the result of the proceeding would have
> been different." *United States v. Bagley*, 473 U.S. 667, 682, 105

> S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Jamison v. Collins*,
> 291 F.3d 380, 385 (6th Cir. 2002)("The prejudice (or materiality)
> element of a *Brady* violation is established if there is a reasonable
> probability of a different outcome of the trial had the *Brady*
> material been available.")  For purposes of determining reasonable
> probability, "[t]he question is not whether the defendant would
> more likely than not have received a different verdict with the
> evidence, but whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of confidence."
> *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d
> 490 (1995).

*Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003).  Petitioner has offered no reason to

undermine this Court's confidence in these proceedings.

Petitioner also asserts that the government concealed an agreement with Shawn Kenny to

reduce Kenny's sentence on "domestic violence, indecent liberties with a child, and others [sic]

charges," and to permit Kenny to remain a member of  the United States Army in exchange for

his  testimony against petitioner.  *Petition*, at 12.  Again, the record is devoid of support for this

claim, and petitioner has provided no reasonable basis to conclude that any evidence outside the

record would support it.

Contrary to petitioner's allegation, the government's immunity agreement with Shawn

Kenny was disclosed prior to trial.  *See* Exhibit C to Return of Writ.  Additionally, in a letter

dated January 7, 1997, the government provided the following information to the defense:

> Please be advised that following acts in March of this year
> (3/29/96), Shawn Kenney was charged in an Article 15 proceeding
> as a result of a domestic situation in which Shawn Kenney
> provided alcohol to and inappropriately touched/kissed his eleven
> year old niece and assaulted (shoved) his wife resulting from the
> aforementioned contact with his niece.
>
> He was formally charged with violations of the Uniform Code of
> Military Justice, Article 128, assault, and Article 134, indecent acts
> and liberties with a child.  It was recommended that he receive a

55

> one grade reduction in rank and pay, fourteen days administrative
> suspension, fourteen days of additional duty, and forfeit one half
> month's pay.  Upon "serving" this sentence, Shawn Kenney has
> recently been promoted and has reconciled with his wife.

Exhibit I to *Return of Writ*.  Petitioner was not denied *Brady* material in this regard.

Petitioner asserts that the government presented false or distorted information to the jury

regarding the explosive device left at the scene of  the CNB robbery.  Petitioner further asserts

that forensic chemist Steven Burmeister failed to indicate whether he had conducted tests to

determine the ratio of ingredients in the explosive device, and that explosives expert Robert

Heckman lied.

> Mr. Heckman claims that this alleged device could explode by
> simply being dropped on the floor.  This is not supported by the
> evidence.  In this case the so-called device was shot twice, once by
> a water cannon, and then by a .50 steel slug.  These two events
> translated into many thousands of foot pounds of energy being
> applied to this so-called device, not once, but twice.

*Petition*, at 13.  Petitioner alleges that Burmeister and Heckman both lied when they testified that

the device left at the CNB robbery was capable of exploding "at the slightest drop," when

"obviously" the device was made to simulate an explosive device.  *Id*.  Similar allegations were

raised on direct appeal, and rejected by the United States Court of Appeals for the Sixth Circuit:

> Langan next maintains that there was insufficient evidence to
> support a verdict that the home-made pipe bomb left at CNB Bank
> constituted a "destructive device" as defined by 18 U.S.C. § 921.
> In order to convict Langan of using a destructive device, the
> government had to prove that the pipe bomb left at the robbery was
> "any explosive, incendiary, or poison gas bomb," 18 U.S.C. §
> 921(a)(4)(A)(i), or "any combination of parts either designed or
> intended for use in converting any device into any destructive
> device described in subparagraph (A) ... and from which a
> destructive device may be readily assembled." 18 U.S.C. §
> 921(a)(4)(C). Langan argues that the government failed to prove
> that the device in question was operable or readily made operable,

and therefore did not qualify as a "destructive device" under the relevant statutes.

When considering a challenge on direct appeal to the sufficiency of the evidence to sustain a conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

To qualify under the statute, we do not require that the destructive device operate as intended. *See United States v. Rushcamp*, 526 F.2d 1380, 1382 (6th Cir.1975). It is sufficient for the government to show that the device was "readily convertible" to a destructive device. *See id.; United States v. Turczyk*, No. 91-3489, 1992 WL 102499, * 2-3 (6th Cir. April 29, 1992) (unpublished table decision) (finding that a pipe bomb with dubious initiator circuitry qualified as a destructive device, even though the defendant testified that he used an "inoperable circuit, bad switches, and dead battery" and had intended for it to be inoperable).

Moreover, the government need not establish that any particular component be present for a device to qualify as a destructive device. The only requirement is that the device be capable of exploding or be readily made to explode. *See United States v. Wilson*, No. 92-5075, 1992 WL 227472, * 2 (6th Cir. Sept.15, 1992) (unpublished table decision) ("[W]e do not read these cases as requiring the government to prove beyond a reasonable doubt that each component is present; instead, the government's burden is to prove beyond a reasonable doubt that the devices are destructive or could be readily made so.").

Langan maintains that the government failed to show that the device contained an explosive main charge. The government counters that the testimony provided by forensic chemist Burmeister and hazardous devices and explosives examiner Heckman established that the CNB pipe bomb had the requisite elements of a "destructive device," including an explosive main charge, a container, and a method of initiation.

Burmeister testified that, based on his forensic analysis, the powder contained within the CNB device was "nonperforated disk double-based smokeless powder ... [and] a composition of calcium

57

sulfate, calcium carbonate, silicon dioxide[,] as well as an aluminum containing material." When heat, shock, or friction is applied to nonperforated disk double-based smokeless powder contained within a plastic pipe, Burmeister opined that it is capable of exploding. Langan faults Burmeister for failing to subject the powder to further testing based on its containing a white inert mixture in addition to smokeless powder. At trial, however, Burmeister testified that although the additional materials were not explosives, they would not affect the explosive propensities of the smokeless powder.

The government then presented Heckman, who addressed the engineering aspects of the device. Heckman stated that he had relied upon Burmeister's chemical analysis of the smokeless powder, and then determined that the explosive had been confined in the plastic pipe enclosed in the lunchbox. As such, he testified that the device was capable of explosion by being thrown or dropped, even if it did not contain an "apparent classic initiator." He also found that the device was equipped with an electric circuit hooked to a pager and powered by two nine-volt batteries, as well as a mercury switch. Based on these findings, Heckman concluded that the device was, in fact, a pipe bomb, which is defined as the purposeful containment of an explosive mixture in order to achieve detonation. *See* 18 U.S.C. § 921(a)(4); 26 U.S.C. 5845(f).

Langan next contends that the device was not capable of being readily made operable because its wires were insulated and had not been soldered to the pager. Heckman, however, testified that it would only take a few seconds to recrimp the wires and strip them properly. The CNB device therefore bears significant similarities to the device in *Turczyk.* As in the case before us, the putative pipe bomb in *Turczyk* had been fragmented by the bomb squad, and government experts were unable to ascertain whether the circuitry would have achieved detonation. *See Turczyk*, 1992 WL 102499 at *3. Explaining that the statute did not demand that the device operate as initially intended, but that it was enough that it be readily convertible into a destructive device, the Turczyk court pointed out that there had been testimony that "even if the circuitry were removed, the device could function by merely connecting the two wire leads to any electrical source on a car." *Id.* This conversion would have required considerably more effort than the conversion Heckman proposed could have been performed on the CNB device. Given the above evidence, it was reasonable for the

58

> jury to have found beyond a reasonable doubt that the CNB pipe
> bomb was indeed a destructive device, which contained an
> explosive mixture and was capable of explosion.

*United States v. Langan, supra*, 263 F.3d at 625-26.

"It is... well settled that a § 2255 motion may not be employed to relitigate an issue that

was raised and considered on direct appeal absent highly exceptional circumstances, such as an

intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999), citing

*Oliver v. United States*, 90 F.3d 177, 180 (6th Cir.1996); *Davis v. United States*, 417 U.S. 333,

345 (1974). Such are not the circumstances here. Burmeister and Heckman both were available

for cross-examination by defense counsel. Petitioner's claim of prosecutorial misconduct by

reason of the submission of allegedly false testimony of Burmeister and Heckman is completely

without support.

Petitioner asserts that the government improperly "influenced and or

intimidated"witnesses in order "to conceal favorable evidence." *Petition*, at 13. Specifically,

petitioner asserts that the government "exerted undue legal and financial pressure" on Dr.

Frederick Whitehurst, who would allegedly have testified for the defense that laboratory

procedures at the FBI were

> sloppy and unscientific, that FBI explosive experts skewed results
> and conclusions in favor of the government's position and made
> statements that were beyond their scope of understanding or
> expertise.

*Id*. Petitioner suggests that the government paid Whitehurst "a large sum of money after firing

him from the FBI" to keep him from testifying as a defense witness.

> After the settlement with the government, Dr. Whitehurst was no
> longer willing to testify and indicated to defense counsel that he
> would be a hostile witness if called.

59

*Petition,* at 14.  Again, such allegations are belied by the record.

The record indicates that, on January 22, 1997, petitioner requested a hearing pursuant to Federal Rule of Evidence 104(a)[14] as to the qualifications of expert witness Robert Heckman, a special agent with the FBI.  Docs. #266, 268  (filed under seal), which motion was granted.  Doc. # 269.  As previously indicated, Heckman was presented as an expert on explosives and hazardous devices.  *Transcript* XIV, at 17.  Heckman examined the device left on the floor of the Columbus National Bank on October 25, 1994, after the bank robbery.  *Id.*, at 19-21.  It was Heckman's opinion that the device was a pipe bomb, *id.*, at 36-37, a destructive device capable of exploding, causing property damage, personal injury, and possibly death.  *Id.*, at 38.  Dr. Frederick Whitehurst, also an F.B.I. employee, was subpoenaed by the defense to impeach Heckman's qualifications.  *See* Docs. #266, 268, 269; *Transcript* XI, at 4-30.[15]  However,

---

[14]  Federal Rule of Evidence 104 provides in relevant part:

(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

[15]  The following exchange took place regarding the subpoena issued for Whitehurst:

COURT: ... While, frankly, the Court has serious reservations, grave doubts in fact that defendant has met the required burden of showing the necessity of the subpoenas for Whitehurst... my present intention is to authorize the issuance of those subpoenas with the understanding, clearly, that after conferring with these three people, unless they are prepared to come here and testify under oath that Mr.

Whitehurst was subsequently placed on administrative leave from the FBI.  *Transcript* XII, at 62.

Nothing in the record supports petitioner's allegation that the FBI or government officials

prevented Whitehurst from testifying for the defense at the Rule 104 hearing, or at petitioner's

trial, nor has petitioner offered any reasonable basis for concluding that support for these

allegations exists outside the record.  To the contrary, the government did not oppose the

presentation of testimony by Whitehurst:

> [Prosecutor]:  They indicated that they had no problem with Dr.
> Whitehurst communicating this information.  They thought he
> understood that when they got the summary to him this morning.
> Jim Maddox agreed, as soon as we hung up, to call Dr.
> Whitehurst's attorney and tell him it's okay.

*See* Transcript XII, at 62.  Additionally, the government disclosed to the defense all the

Whitehurst documents regarding the F.B.I. Laboratory Explosives Unit.  *See* Doc. #191 (filed

under seal). Defense counsel later withdrew Whitehurst's subpoena as follows:

> MR. DURKIN: At this point the defendant is not requesting to
> subpoena Fred Whitehurst for the purposes of the 104 hearing
> tomorrow.  I still would want him to be subpoenaed with respect
> to the testimony during the defense's case, but he does not want to
> have his presence here tomorrow for the 104(a) hearing.
>
> COURT: You are withdrawing that subpoena.
>
> MR. DURKIN: I am, your Honor.

*Transcript* XII, at 100.  Although Whitehurst remained under subpoena for trial, *id*., at 110-114,

---

> Heckman was not qualified to do what he did and render the opinions that he did,
> that those requests would be withdrawn.
>
> MR. DURKIN: Absolutely, your Honor.

*Transcript* XI, at 30.

he was never called as a defense witness.  This claim is without merit.

In his traverse, Petitioner requested that the Whitehurst documents that were originally filed under seal be unsealed.  Since the government has not opposed this request, the Court orders that these documents be unsealed.

Petitioner complains that the government concealed the existence of potential defense witness David Laud and that Mark Thomas, a government informant, "gave false and misleading information to defense counsel as to his willingness to testify in behalf of the defendant, and as to what he would testify to."  *Petition*, at 14.        Petitioner raised the same claim regarding Laud in his December 16, 1997, motion for a new trial.  Doc. #455.[16]   After an evidentiary hearing, this Court concluded that information contained in Laud's interview with the FBI was neither material nor exculpatory under *Brady v. Maryland, supra, see* Doc. #484, at 7-10, 23-25, and did not warrant granting a new trial.  Petitioner has provided no reason for this Court to reconsider that decision here.

---

[16]  Petitioner asserted in relevant part:

[D]efense counsel was not provided with the FD 302's of David Laud....

\*\*\*

David Laud was interviewed on September 19, 1996, by Sas Messer and Martinez in Gainesville, Florida.... Mr. Laud told the FBI that he accompanied Shawn and Tabitha Kenny to the skinhead concert held at Mark Thomas' property on April 30, 1994.  He also stated that Kenny stayed with him and Tabitha Kenny for most of the time and might have gone off on his own for a little while during the hour or hour and a half that they spent at the concert.... He also stated he believed Shawn Kenny was in a state of drunkenness while at the concert.

*Motion for New Trial*, Doc. #455, at 7.  In his motion for new trial, petitioner argued that such information would have impeached Shawn Kenny's testimony.  *Id*., at 4-5.

Petitioner's allegation that Mark Thomas acted as a government informant is likewise without support in the record, and petitioner has provided no reasonable basis for this Court to conclude that such allegations are supported by evidence outside the record.[17] This claim is likewise without merit.

Petitioner next asserts that the government concealed information favorable to the defense regarding Richard Guthrie's "history of violent attacks upon his friends, family, and associates." *Petition*, at 14.

> The government knew that Richard Guthrie had shot his own brother Nick Guthrie in a fit of anger, the government knew that Richard Guthrie had stalked and assaulted his former associate Norman Smith on numerous occasions including one occasion in Martinsville, West Virginia. At the time Richard Guthrie was arrested while pointing a shotgun at the home of Norman Smith threatening to kill him [sic]. This arrest brought Richard Guthrie to the attention of federal law enforcement. The government refused to turn over the military record of Richard Guthrie... The government was also aware of many other violent incidents that Richard Guthrie instigated but were never filed in official records.

*Petition*, at 14-15.[18] Contrary to petitioner's allegation, the record indicates that, on July 15,

---

[17] Respondent responds to petitioner's allegation regarding Mark Thomas as follows:

At the time Mark Thomas met with defense counsel to discuss the possibility of testifying for Mr. Langan, he was a suspect in an investigation out of Philadelphia. He was not working for the government. He was being investigated by the government. Thomas was arrested subsequent to any meetings he may have had with defense counsel. He subsequently pled guilty in Philadelphia.

*Return of Writ,* at 104.

[18] As previously noted, Guthrie was deceased at the time of trial. *See Docket*, July 12, 1996. Therefore, none of Guthrie's statements to police was admitted at trial, although some statements by Guthrie to a co-conspirator, previously discussed, were admitted against petitioner

1996, the government provided to the defense certain memoranda regarding F.B.I. interviews

with Guthrie on January 15 and 17, 1996, and on March 22, 1996. *See Notice of Delivery of*

*Jencks Material*, Exhibit J to Return of Writ. Additionally, on January 8, 1997, the government

provided memoranda regarding F.B.I. interviews with Guthrie's brother and father. *See Notice*

*of Delivery of Jencks and Giglio Material to Defense Counsel by the United States*, Exhibit C to

Return of Writ. Further, Nicholas Guthrie, Richard Guthrie's brother, agreed to speak with

defense counsel during trial and provided defense counsel with a number where he could be

reached. *Transcript*, IX, January 22, 1997, at 68, 73-74. Petitioner has failed to establish that

the government failed to disclose any material or exculpatory evidence regarding Richard

Guthrie.

      Lastly, petitioner asserts that the government concealed exculpatory evidence regarding

ownership of the pager attached to the destructive device left at CNB during the robbery:

> This evidence was documented by the case agent William Davitch.
> The defendant came across this evidence after both trials were
> over, it came in a discovery package prepared by the U.S. Attorney
> in Pennsylvania, in regard to a conspiracy case which was later
> dismissed.

*Petition,* at 15. Petitioner has attached in support of this claim what purports to be an August 14,

1995, F.B.I. report by Special Agent William J. Davitch which indicates as follows:

> [Jana Elb] was advised that Mobile Media had been previously
> contacted in November, 1994, concerning a pager that had been
> purchased by her company in January, 1988. Elb was advised that
> Brian Warren and Corinne Dillon were contacted concerning this
> pager but no information had been received from them. Elb was
> again provided with the serial number of the pager. After
> searching her database, Elb advised that the BPR pager with serial

at trial.

number 615BNA1260 was an active pager and was assigned to the Baltimore, Maryland, database system.  Elb advised that this pager was active and being paid for at this time.

Elb stated that a subpoena would be needed to provide the FBI with any additional information concerning the account holder of Motorola pager serial number 615BNA1260.

On July 7, 1995, a grand jury subpoena from the Southern District of Ohio was sent via facsimile to Mobile Media.

On August 9, 1995, Elb sent via facsimile copies of Mobile Media records concerning the account holder of the Motorola pager with serial number 615BNA1260.  This pager was assigned to a company in Pikesville, Maryland, called Boneh Development. Boneh Development had an account with Mobile Media in care of Samuel Kleiner, 115 Sudbrook Land, Pikesville, Maryland. Kleiner's account with Mobile Media was paid for on an annual basis and was billed through November 1, 1995.  The pager was assigned telephone number 410-237-1097 and had been in service since January 22, 1991.  Elb indicated that the pager was a customer owned pager.  On November 29, 1993, the customer changed the billing to an annual billing effective January, 1994. Mobile Media received a payment of $105.00 on November 28, 1994.

*Petitioner's Exhibit D-1,* attached to Traverse.  Assuming that the pager referred to above concerns the same pager involved in this case, which is not at all clear, it does not appear that actual ownership of the pager was ever established.

Claim three is without merit.

## VI.  CLAIM FOUR - JURY MANIPULATION

In claim four, petitioner asserts that the Clerk of the United States District Court for the Southern District of Ohio was biased against petitioner and improperly selected a jury pool so as to deprive petitioner of a fair trial.  Petitioner asserts that an employee of the Clerk's Office, an African-American, manipulated jury pool numbers so that numerous African-Americans were

made a part of the venire in the trial of petitioner, a self-proclaimed white supremacist. *Petition,*

at 31. Petitioner further asserts that the Clerk's Office has engaged generally in a pattern and

practice of manipulating jury pools in criminal cases to favor the government. This claim is

raised only as to the jury pool and the jury actually selected for petitioner's second trial on the

assault and related charges. *See Traverse*, at 7-8, 66.[19]   Petitioner asserts as follows:

> [P]rior to the trial of Langan II... there were major questions as to
> the make up of the array or order in which jurors had been
> numbered.... After examining [jury questionaires] it was obvious
> that this jury pool order had been tampered with as to the order in
> which jurors would be presented. This order placed a
> disproportion[ate] number of black jurors into the selection process
> with low numbers, in some case the original number assigned had
> been altered in a crude and obvious manner....What ended up
> happening was the same jury pool was remixed in a random
> fashion. The petitioner was not satisfied with this but was forced
> to proceed due to counsel's refusal to pursue the matter further.

*Traverse,* at 67. Petitioner failed to raise this issue, which appears on the record, on direct

appeal. Therefore, before claim four will be entertained on collateral review, petitioner must

show cause for his failure to properly raise such claim, as well as actual prejudice resulting from

the error. *Napier v. United States*, 159 F.3d 956, 961 (6th Cir. 1998), citing *United States v.*

*Frady*, *supra*, 456 U.S. at 167-68. As cause for his procedural default of claim four, petitioner

asserts the ineffective assistance of appellate counsel. *See Traverse*. However, such claim is

without merit, and petitioner, therefore, has failed to establish either cause or prejudice for his

---

[19] On December 19, 1996, prior to his first trial on bank robbery and related charges, petitioner filed a motion to stay proceedings pursuant to 28 U.S.C. §1867. Doc. #230. Petitioner argued that the inclusion on the venire of prospective juror #87, a fireman, and prospective juror #241 was improper. *See* Doc. #230. Petitioner raised no issue regarding the manner in which prospective jurors were chosen, nor did he argue that any segment of the population had been systematically excluded from the jury pool. *See* Doc. #242, at 6. After a hearing, petitioner's motion was denied as without merit. *Id.*

procedural default of claim four.

On August 20, 1997, petitioner filed a motion challenging jury selection pursuant to 28 U.S.C. §1867.  Doc. #389.  Petitioner alleged that the number of African-American jurors on the prospective jury pool outweighed the number that should have resulted from random selection. *See id.*  However, on August 21, 1997, petitioner's motion was withdrawn with prejudice, when both parties agreed that names of all prospective jurors summoned to appear and not excused would be placed in the jury wheel and re-drawn by the courtroom deputy clerk in the presence of all parties.  *Transcript*, August 21, 1997, at 28.  The Court summarized the agreement:

> [A]greement to this procedure does not in any way infer any agreement or any inference that there was any defect of any kind in the selection of the persons on the original list.  Instead, it [is] simply an additional guarantee that all prospective jurors have been randomly selected and further it will permit the trial to go forward as scheduled next week.

> [I]t is understood that all persons who have been summoned regardless of their race, African-Americans, white or any other race, creed or color, will be included in the draw from the jury wheel and all will have an equal opportunity to be selected.

> While the distribution of African-Americans was mentioned in the defendant's motion, the defendant contends that this was not done in order to exclude any African-Americans from jury service but only as alleged evidence of a statistical imbalance that caused the defendant to question the randomness of the selection process and to file the motion in question.

> [D]efendant's motion is withdrawn... with prejudice.  That is with an understanding that he is satisfied with the procedure that I have just described; that he can make no claim regarding the processes that produced the original list or any revisions in that list as compiled by taking the names out of the jury wheel in the procedure that I have just described.

*Id.*, at 29-30.  Further, petitioner explicitly agreed to the procedure described by the Court.

> COURT: Is that agreed upon, those terms and conditions that I have just read, Mr. Langan?
>
> DEFENDANT: It is agreed upon.

*Id.*, at 30.

In sum, nothing in the record provides any support for petitioner's allegations here. For all of the foregoing reasons, petitioner has failed to establish cause or prejudice for his procedural default of claim four.

## VII.  CLAIM FIVE - SEVERANCE OF TRIALS

In claim five, petitioner asserts that he was denied a fair trial because the Court refused to grant a severance of trials on the two bank robbery counts. Petitioner failed to raise this issue at trial or on direct appeal.[20] Therefore, before claim five will be entertained on collateral review, petitioner must show cause why he did raise the claim on direct appeal, and actual prejudice resulting from the error. *Napier v. United States*, 159 F.3d at 961. As cause for his procedural default of claim five, petitioner asserts the ineffective assistance of appellate counsel. *See Traverse*.

Pursuant to Federal Rule of Criminal Procedure 8(a):

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

*Id*. Offenses are "connected together" if "the joined counts are logically related, and there is a

---

[20] Petitioner never argued that the two bank robberies were misjoined under Rule 8(a). *See Memorandum and Order*, September 4, 1996, at 2, n.3, Doc. #162.

68

large area of overlapping proof." *United States v. Wirsing*, 719 F.2d 859, 863 (6th Cir. 1983)(internal quotations and citation omitted). Joinder under this provision is permissive, and the rule is to be construed liberally to promote the goals of judicial economy and trial efficiency. *Id.*, at 862.

On September 4, 1996, this Court granted petitioner's request for severance of counts one through five from counts six through twelve pursuant to Rule 8(a). *See* Doc. #162. The Court denied petitioner's request to sever the two bank robbery trials as follows:

> Because the two bank robberies were properly joined under Rule 8(a)(FN), the Court must determine whether these offenses should nevertheless be severed pursuant to Rule 14 of the Federal Rules of Criminal Procedure. It is the opinion of this Court that severance is not required under Rule 14. Rule 14 provides in pertinent part as follows:
>
> > If it appears that a defendant... is prejudiced by joinder of offenses... in an indictment... or by such joinder for trial together, the court may order an election or separate trials of counts... or provide whatever other relief justice requires.
>
> FN: As stated... defendant did not challenge joinder of the two bank robberies under Rule 8(a).
>
> ***
>
> In the Court's view, defendant has failed to sustain his burden of demonstrating that specific and compelling prejudice will result if his motion for severance is not granted. Furthermore, it appears at this point that evidence of the two robberies would be admissible in separate trials, which means that no prejudice occurs by a joint trial.... Moreover, there does not appear to be a likelihood of jury confusion in this case.

Doc. #162 (citations omitted).

A district court's refusal to grant a severance of trials under Rule 14 is reviewed for

abuse of discretion.  *United States v. Marks*, 209 F.3d 577, 584 (6th Cir. 2000), citing *Zafiro v.*

*United States*, 506 U.S. 534, 541 (1993)[additional citation omitted.] Further,

> [t]o prevail on a claim of misjoinder, a defendant must show
> compelling, specific, and actual prejudice from the misjoinder of
> defendants or offenses. *See United States v. Sherlin*, 67 F.3d 1208,
> 1215 (6th Cir.1995); *United States v. Epley*, 52 F.3d 571, 578 (6th
> Cir.1995); *United States v. Medina*, 992 F.2d 573, 587 (6th
> Cir.1993).

*United States v. Marks, supra,* 209 F.3d at 584.

> Review of errors involving misjoinder is subject to the harmless
> error provision of Federal Rule of Criminal Procedure 52(a), which
> permits reversal only for trial errors that "affect substantial rights."
> *See United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88
> L.Ed.2d 814 (1986). "[A]n error involving misjoinder 'affects
> substantial rights' and requires reversal only if the misjoinder
> results in actual prejudice because it had substantial and injurious
> effect or influence in determining the jury's verdict." *Id.* (quotation
> omitted). Applying this standard, the Supreme Court in *Lane*
> identified a number of factors which showed that misjoinder was
> harmless in that case, including the overwhelming evidence of
> guilt, the fact that limiting instructions were given to the jury, and
> the fact that evidence concerning the misjoined counts would have
> been admissible in separate trials absent joinder. *Id.* at 450, 106
> S.Ct. 725.

*United States v. Chavis,* 296 F.3d 450, 461(6th Cir. 2002).

The June 8, 1994, robbery of the Society National Bank in Springdale, Ohio, and the

October 25, 1994, robbery of the Columbus National Bank were both inspired by the acts of

bandits described in "The Silent Brotherhood," and committed to finance petitioner's neo-Nazi

group which planned to overthrow the United States Government.  *See United States v. Langan*,

*supra*, 236 F.3d at 613.  As noted *supra,* it appeared that evidence regarding both robberies was

admissible even in separate trials.  *See* Doc. #162, at 13.  Based upon the foregoing, and for the

reasons discussed at length in this Court's order denying petitioner's request for a severance of

70

trials, *id.*, petitioner's appellate counsel was not constitutionally ineffective for failing to raise this issue on direct appeal. Accordingly, petitioner has failed to establish cause or prejudice for his procedural default of claim five.

## VII. CLAIM SIX - CONFRONTATION CLAUSE

In claim six, petitioner asserts that he was denied his right to confront witnesses against him when Richard Guthrie's statements were admitted at trial. As previously indicated, Guthrie was deceased and therefore unavailable at the time of petitioner's trial. Petitioner fails to specify the particular statements of Guthrie; however, the record reflects that Shawn Kenny testified that Guthrie paid Kenny in June 1994 for Kenny's assistance in planning the Springdale bank robbery (*Transcript*, IV, January 14, 1997, at 62):

> A. [Guthrie] had talked about a bank we had cased earlier, the Springdale one. And in the conversation he was pretty upset that the dye pack had gone off and he had also lost an item of his that he was upset about.
>
> Q. Did he indicate what item had been lost?
>
> A. It was a scanner, police radio scanner.
>
> Q. Was this a scanner that you had seen in previous times?
>
> A. Yes.
>
> Q. Did he indicate to you anything about how the robbery had occurred and who was involved in it?
>
> [Objection overruled.]
>
> A. Yes. He had indicated that he and Pete had carried it out basically the way that we had planned.
>
> Q. What way was that?
>
> A. It was parked as far as driving and using the same layout where

71

we had parked the car when we had made our attempts. And as far as going in and telling the people that he had a scanner, not to trip any alarms because he would hear of any, you know, police or what not on their way to the scene. He had talked about Rich – or, I'm sorry, Pete – Pete had done the vaulting, we call it, as far as going over and going behind the counter and securing the area back there.

Q. This was all similar things you had discussed back when you did the dry run.

A. As far as the approach and the setup and the scanner. But as far as what they were going to do on the inside, I wasn't too sure on that. That was amongst themselves.

Q. So this was described by you to [sic] Mr. Guthrie when he was providing you this $200 in money that had the red stain on it.

A. Yes.

*Id.,* at 66-68.[21]

Again, petitioner failed to raise this claim on direct appeal. He therefore must establish cause for his failure to raise this claim earlier, as well as actual prejudice resulting from the error before this claim may be considered here. *Napier v. United States*, *supra*, 159 F.3d at 961, citing *United States v. Frady*, *supra,* 456 U.S. at 167-68. Petitioner again asserts the ineffective assistance of appellate counsel as cause for his procedural default of this claim. *See Traverse*.

Guthrie's statements were admitted at trial pursuant to Federal Rule of Evidence 801(d)(2)(E).[22] As the Sixth Circuit explained in *United States v. Kendricks*, 623 F.2d 1165 (6th

---

[21] As noted by respondent (Return of Writ, at 116), Kevin McCarthy later also testified that Scott Stedeford said that Guthrie had rented a "safe house" in Columbus, Ohio under a false name. *Transcript,* XV, January 30, 1997, at 35-36. However, petitioner raises a Confrontation Clause claim only as to admission of Richard Guthrie's statements.

[22] Federal Rule of Evidence 801(d)(2)(E) provides:

Cir. 1980):

> Fed.R.Evid. 801(d)(2)(E) allows the admissibility of extrajudicial statements prejudicial to a defendant as long as four prerequisites are met: the statements must have been made by a co-conspirator of the defendant; they must have been made during the pendency of the conspiracy; they must have been made in furtherance of the conspiracy; and the existence of the conspiracy and the defendant's participation in it must be established at trial.

*Id.,* at 1167.

The Court found that these requirements were met here:

> COURT: ... [T]he proffered statement of Mr. Guthrie... is being offered under the provisions of Rule 801(d)(2)(E) as a co-conspirator's statement made during the course of and in furtherance of the conspiracy.
>
> I have carefully reviewed and considered all of the evidence presented by the government at this point and I have concluded that the government has established by a preponderance of the evidence that the defendant, Peter Kevin Langan, Richard Guthrie and Shawn Kenny were members of a group that conspired to rob the Springdale bank and other banks for the purpose of obtaining portions of the proceeds of the robberies for their cause, being the advancement of white supremacist beliefs.

------

(d) Statements which are not hearsay. A statement is not hearsay if--

*** 

(2) Admission by party-opponent. The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

> The evidence is sufficient to show the existence of this conspiracy prior to the robbery of the Springdale bank and also that it was still in existence after the robbery of that bank in June 1994.
>
> The government has represented that the proffered statement was made during June 1994 –
>
>          ***
>
> – during the existence of this conspiracy....
>
> I will, accordingly, admit the statement under the provisions of Rule 801(d)(2)(E).

*Transcript*, IV, January 14, 1997, at 64-65. Although petitioner argues that Kenny's statements at best constituted the "boasting of a lying braggert," and did not fall within Federal Rule of Evidence 801(d)(2)(E), *see Traverse,* at 68, this Court is not persuaded by petitioner's argument.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to physically confront and cross-examine adverse witnesses at all stages of the trial. *Illinois v. Allen*, 397 U.S. 337, 388 (1970). However, non-testimonial out-of-court statements of co-conspirators, properly admitted pursuant to Rule 802(d)(2)(E), are exempt from Sixth Amendment challenges.

> When a statement satisfies the requirements for a co-conspirator statement under Federal Rule of Evidence 801, both the Rules of Evidence and the Confrontation Clause allow the government to introduce the statement through a witness who heard the statement, even if the government cannot show that the co-conspirator is unavailable. *United States v. Inadi*, 475 U.S. 387, 400, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). In short, the Confrontation Clause does not give the defendant the right to cross-examine a person who does not testify at trial and whose statements are introduced under the co-conspirator hearsay exclusion. *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *cf. United States v. Kehoe*, 310 F.3d 579, 590-91 (8th Cir.2002) (holding that the Confrontation Clause did not guarantee the defendant the right to cross-examine a speaker whose statements were imputed to the

74

> defendant as adoptive admissions of a party opponent*), cert.
> denied*, 538 U.S. 1048, 123 S.Ct. 2112, 155 L.Ed.2d 1089 (2003).

*United States v. Reyes*, 362 F.3d 536, 541 (8th Cir. 2004). *See also Bourjaily v. United States*,

483 U.S. 171, 181-82 (1987)("[T]he requirements for admission under Rule 801(d)(2)(E) are

identical to the requirements of the Confrontation Clause, and since the statements were

admissible under the Rule, there was no constitutional problem"); *Anthony v. DeWitt*, 295 F.3d

554, 561 (6th Cir. 2002);

    As petitioner notes, in *Crawford v. Washington*, 541 U.S. 36 (2004), well after petitioner

filed the instant habeas petition, the Supreme Court held that the Confrontation Clause bars the

introduction of testimonial statements of a witness who does not appear at trial unless the

witness is unavailable to testify and the defense had a prior opportunity for cross-examination.

While *Crawford* redefined the test for the admission of testimonial statements such as prior in-

court testimony and police interrogations, *id.* at 51-52, it left intact prior Supreme Court

jurisprudence with respect to non-testimonial statements, including statements that fall within the

confines of Rule 801(d)(2)(E). "Where nontestimonial hearsay is at issue, it is wholly consistent

with the Framers' design to afford the States flexibility in their development of hearsay law--as

does *Roberts*, and as would an approach that exempted such statements from Confrontation

Clause scrutiny altogether." *Id.* at 68.

    Because Mr. Guthrie's statements to Shawn Kenny were not testimonial statements,

*Crawford* is inapplicable, and the admission of those statements against petitioner did not violate

the Confrontation Clause.[23] *See United States v. Holmes*, –F.3d–, 2005 WL 768942 at *4 (5th

---

[23] *Crawford* did not constitute clearly established federal law at the time of petitioner's

convictions, and thus, arguably, is inapplicable to this case. *Lies v. Jackson*, 100 Fed.Appx. 378,

75

Cir. April 6, 2005)("Statements made by a co-conspirator during the course and in furtherance of

a conspiracy are by their nature generally non-testimonial and thus are routinely admitted against

an accused despite the absence of an opportunity for cross-examination"); *United States v.*

*Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004); *United States v. Lee*, 374 F.3d 637, 644-45 (8th

Cir. 2004); *United States v. Delgado*, 401 F.3d 290, 299 (5th Cir. 2005); *United States v.*

*Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005).

Petitioner has thus failed to establish the ineffective assistance of appellate counsel in

failing to raise on direct appeal an issue regarding the Confrontation Clause. He has therefore

failed to establish cause and prejudice for his procedural default of claim six.

## VIII. CLAIM SEVEN - LIFE SENTENCE

In claim seven, petitioner asserts that he was improperly sentenced to life without

possibility of parole "when it is beyond the statutory maximum for armed bank robbery, [and]

the issue of this offense being a second or subsequent offense never went to the jury." *See*

*Petition*.

To the extent that petitioner claims that the court erred in enhancing his sentence, this

claim has already been considered and rejected by the United States Court of Appeals for the

Sixth Circuit:

> Langan maintains that the district court improperly enhanced his
> sentence under 18 U.S.C. § 924(c)(1). Specifically, Langan objects
> to the treatment of Counts 2, 4, and 5 as "second or subsequent
> convictions," arguing in "good faith" that his life sentence should
> be reversed. The district court's application of 18 U.S.C. § 924(c)

---

unpublished, 2004 WL 1203051 (6th Cir. May 24, 2004)  This Court need not consider the issue,
however, since Guthrie's statements are admissible under both *Crawford* and earlier decisions of
the United States Supreme Court.

> is a question of law which we review *de novo. See United States v. Deal*, 954 F.2d 262, 262-63 (5th Cir.1992), *aff'd,* 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).
>
> Langan frankly acknowledges that the basis of his objection is in direct conflict with the Supreme Court's holding in *Deal v. United States*, 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). As the Supreme Court explained, if a defendant is charged with and convicted of separate offenses to which § 924(c) applies, the separate convictions on the associated § 924(c) counts can be used to determine previous and subsequent convictions. *See Deal*, 508 U.S. at 132-34, 113 S.Ct. 1993 (1993). Because Langan was convicted of the two separate and distinct armed robbery violations, his § 924(c) convictions relating to those underlying violations qualify as a previous and subsequent conviction. Nevertheless, Langan argues that *Deal* should be overruled. We are of course without authority to disregard controlling Supreme Court precedent. Langan's challenge to his sentence is therefore rejected. Accordingly, the district court did not err in enhancing Langan's sentence for the second § 924(c)(1) conviction.

*United States v. Langan, supra*, 263 F.3d at 626. Because claim seven was raised and decided on direct appeal, petitioner cannot now re-litigate this issue in a motion to vacate sentence under 28 U.S.C. §2255. *See United States v. DuPont*, 76 F.3d 108, 110 (6th Cir. 1996); *Oliver v. United States* 90 F.3d 177, 180 (6th Cir. 1996). "A §2255 motion may not be used to re-litigate an issue that was raised on appeal absent highly exceptional circumstances." *United States v. Brown*, 62 F.3d 1418 (6th Cir.) (unpublished) (citations omitted), *cert. denied*, 516 U.S. 942 (1995). *See also Giraldo v. United States*, 54 F.3d 776 (6th Cir. 1995) (unpublished) ("It is well settled that a §2255 motion may not be employed to re-litigate an issue that was raised and considered on appeal absent highly exceptional circumstances, such as an intervening change in the law."); *Ford v. United States*, 36 F.3d 1097 (6th Cir. 1994) (unpublished) (same); *Kelly v. United States*, 977 F.2d 581 (6th Cir. 1992) (unpublished).

Petitioner also claims that the issue of whether this offense was a second or subsequent

offense should have been decided by a jury.  His argument is based on the Supreme Court's recent decisions in *Blakely v. Washington,* 124 S.Ct. 2531 (2004), and *United States v. Booker*, 125 S.Ct. 738, 764 (2005).  In *Booker*, the Supreme Court reaffirmed the rule expressed in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."  The Court concluded that the Sixth Amendment prevents judges from increasing a sentence based on facts not found by the jury or admitted by the defendant.  *Booker*, 125 S.Ct. at 745-47, 756.

The Sixth Circuit has recently held that *Booker* cannot be applied retroactively to cases on collateral review.  *Humphress v. United States*, 398 F.3d 855 (6th Cir. 2005).  Petitioner was sentenced on December 18, 1998.  *See* Doc. #495.  On August 31, 2001, his convictions and sentence were affirmed by the United States Court of Appeals for the Sixth Circuit.  *See United States v. Langan, supra,* 263 F.3d at 613; Doc. #519.  Thus, petitioner's convictions were final long before the Supreme Court's decisions in *Blakely* or *Booker*.[24]

For these reasons, petitioner's seventh claim is without merit.

## IX.  CLAIM EIGHT - CHANGE OF VENUE

In claim eight, petitioner asserts that he was denied a fair trial because the Court refused to grant his request for a change of venue because of pre-trial publicity.  Again, petitioner failed to raise this claim on direct appeal.  Therefore, he must establish cause for his failure to earlier

---

[24]  Furthermore, although not necessary to this opinion, the Court notes that the § 924(c) convictions that were used to enhance petitioner's sentence appear to fall within the exception set forth in *Apprendi, i.e.*, "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."  530 U.S. at 490 (emphasis added).

raise this claim, as well as actual prejudice resulting from the error before this claim may be considered here. *Napier v. United States*, *supra*, 59 F.3d at 961, citing *United States v. Frady*, *supra*, 456 U.S. at 167-68. Petitioner again asserts the ineffective assistance of counsel as cause for his procedural default. *See Traverse*.

The record indicates that, on June 24, 1996, and on December 16, 1996, petitioner filed motions to change the venue of his bank robbery trial. Docs. #85, 228. In his June 24, 1996, motion, petitioner asserted that he could not obtain a fair and impartial

> trial at any place fixed by law for holding court in the Southern District of Ohio because there exists in this district too great a prejudice against the Defendant.

Doc. #85. In support of this motion, petitioner attached media reports regarding his case. *See* Doc. #228; *Transcript*, BR-VD, at 7. Defense counsel agreed that the Court could not make a determination regarding petitioner's request for a change of venue until *voir dire* had been completed. *Transcript*, BR-VD, at 7. During *voir dire*, all prospective jurors were asked by the Court:

> Ladies and gentlemen, let [me] ask you this: Have any of you ever read or seen or heard anything at all about the defendant in this case, Peter Kevin Langan, or anything at all about this case before coming to the courtroom this morning? Have you ever read anything, seen anything, heard of anything at all about either Mr. Langan or about this case or any aspect of it? If you have, please raise your hand but do not answer it.
>
> Let me first, if you would, if your answer would be yes, you have seen something or heard something or read something about this case or about Mr. Langan or any aspect of this case before coming to court this morning, please raise your hand and stand, state your name and your jury identification number and that is all at this time.

*Id.*, at 102-03. Seven prospective jurors raised their hands. *Id.*, at 103-04. They were

79

questioned at length regarding their media exposure, and whether they believed that they could

serve as fair and impartial jurors in this case. *Id*., at 103-129. Three of these prospective jurors

were excused for cause. *Id.*, at 129-133. Defense counsel did not request that any of the other

four prospective jurors be excused from the venire, nor does the record reflect that any of the

remaining prospective jurors were biased or unable to serve as fair and impartial jurors because

of their exposure to any media coverage in this case. *Id.* All stated that they could decide the

case solely on the evidence presented. *Id*., at 107, 108, 114, 120-121, 124-25. Further, jurors

were repeatedly advised not to read anything about the case, and not to watch anything on

television or listen to anything about the case.

> It is just so important that you keep your minds completely open,
> ladies and gentlemen.

*Id*., at 178-179. At the conclusion of *voir dire*, the Court denied petitioner's motion for a change

of venue. *Id*., at 123-24.

Prior to his second trial, petitioner again argued that he could not receive a fair trial due

to pretrial publicity in this case. Again, all prospective jurors who indicated that they had any

media exposure regarding the case were individually questioned. *Id*., at 139-181; *Transcript*, A-

VD-II, at 15-105; 141-146. All but seven of these prospective jurors were excused for cause.

*Transcript*, A-VD-IV, at 5-6. All of the remaining seven prospective jurors represented that they

would be fair and impartial. *Id*, A-VD-II, at 16-20; 31-35; 77-80; A-VD-III, at 157-160; 162-

165; 169-172. The Court again denied petitioner's request for a change of venue:

> I have carefully considered the motion, as well as all of the
> exhibits that have been brought to my attention....
>
> In ruling on that motion for a change of venue, I have, of course,
> looked at Rule 21 of the Federal Rules of Criminal Procedure and

given very careful consideration to the question that is posed by that rule, namely whether there "exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."

... I am satisfied that there has been no showing of such prejudice. And I am further satisfied that the very extensive voir dire conducted by the Court and by the parties over the course of the past four days has served the purpose of providing a group of prospective jurors who, by their answers given under oath, can insure the defendant of a fair and impartial jury.

*** 

I think that it is not unexpected that... the defendant's subsequent trial on charges involving two bank robberies would generate publicity. But the fact that the media has considered the defendant to be a newsworthy subject... that in itself clearly in my view does not create a need to transfer the trial elsewhere.

*** 

I believe that the Court and the parties themselves have taken very appropriate steps to assure Mr. Langan a fair and impartial trial. As Ms. Jones has pointed out, the vast majority of the panel summoned in this case had no knowledge whatsoever of Mr. Langan before coming to the courthouse in response to those summons. Those members of the panel who did recall references to Mr. Langan or prior events involving him were very, very carefully questioned individually, questioned by the Court and by counsel for the parties outside the presence of other panel members.

Of that group many were excused simply because there was no objection by the government, and more have been excused since then because I am, as I stated earlier this morning, customarily lenient in granting requests for excuses that are even arguably based on cause....

The few prospective jurors who remained assured the parties and the Court – and they did so to the complete satisfaction of the Court – that they would be fair and impartial jurors, and the Court was satisfied that there was no legitimate basis for finding that those few remaining persons should be excused....

81

> I believe firmly that the voir dire process involved in this case well served the historical function of that process. And as a result, I am convinced that the defendant can, and that the defendant will, receive a fair and impartial trial by the persons who remained after that process was concluded and from whom the parties have selected a jury of twelve men and women, the other four alternates, to function as the jury and the alternates in this case.

*Transcript,* A-VD-IV, at 54-55.

The record simply fails to reflect that there existed pretrial publicity of such a nature that petitioner could not receive a fair trial. *See, e.g. Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Irvin v. Dowd*, 366 U.S. 717 (1961). This case was not one with a "trial atmosphere... utterly corrupted by press coverage," or where "influence of the news media... pervaded the proceedings," nor was petitioner's trial conducted in a "circus atmosphere." *See Murphy v. Florida*, 421 U.S. 794, 798-99 (1975)(citations omitted). Further, the record does not reflect a "pattern of deep and bitter prejudice" by potential jurors or "so huge a wave of public passion" that petitioner could not receive a fair trial in this district. *See Irvin v. Dowd, supra*, 366 U.S. at 727-28 (citations omitted). Additionally, nothing supports petitioner's claim that any particular juror was biased against him.

> It is not required... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or

82

> opinion and render a verdict based on the evidence presented in
> court.

*Id.*, at 722-23.

In view of the foregoing, petitioner has failed to establish the ineffective assistance of

counsel under the test set forth in *Strickland* due to his attorney's failure to raise on appeal a

claim that he was denied a fair trial due to pretrial publicity.  Petitioner has likewise failed to

establish cause and prejudice for his procedural default of claim eight.

## X.  CLAIM NINE - JURY VIEW

In claim nine, petitioner asserts that he was denied a fair trial due to the Court's refusal to

grant a jury view of the location of his arrest.  On April 14, 1997, prior to petitioner's assault

trial, the Court granted a joint request by the government and petitioner for a jury view of 585

Reinhard Avenue (the location of petitioner's arrest), and of the white van in which petitioner

was arrested.  *See* Docs. 143, 320.  However, on August 27, 1997, the Court reconsidered that

decision as follows:

> [D]uring an April 25, 1997 conference, counsel informed the Court
> of various changes to this area, including the removal of a fence
> that had been there on January 18, 1996 and the construction, and
> partial destruction due to fire, of a garage, which, according to the
> government, would have obstructed the view of surveillance teams
> had it been there on January 17 and 18, 1996.  Given these
> substantial changes to the physical characteristics of the scene, the
> Court questioned the value of a jury view of the scene, vacated the
> portion of its previous Order granting a jury view of the scene, and
> granted the parties leave to make an appropriate motion if a jury
> view was still desired.
>
> During an April 30, 1997 conference, the defendant made an oral
> motion for a jury view of the area on the basis that a jury view may
> clarify the evidence for the jury.  The government opposed this
> motion on the basis of the physical changes to the scene and the
> concern that these changes would result in confusion to the jury as

to how surveillance of 585 Reinhard Avenue and the van could have occurred on January 17 and 18, 1996.... Defendant continues to seek a jury view of "the crime scene" in order to "provide jurors some context and perspective to two-dimensional exhibits and... [to] permit the jurors to better understand the evidence admitted at trial." (*Defendant's Supplemental Memorandum in Support of a Jury View*, June 11, 1997, at 1.) The government continues to assert that a jury view of the crime scene would not be helpful to the jury and indeed might be confusing and misleading to the jury given the changed circumstances of the area.

The decision to permit a jury view is committed to the sound discretion of the Court. *See, e.g., United States v. Passos-Paternina*, 918 F.2d 979, 986 (1st Cir. 1990), *cert. denied*, 499 U.S.982, and cert. denied, 501 U.S. 1210 (1991); *Hughes v. United States*, 377 F.2d 515, 516 (9th Cir. 1967); *Casias v. United States*, 302 F.2d 513, 514 (10th Cir. 1962). The undisputed structural changes to the alleged crime scene – specifically the removal of the fence and the construction, partial destruction, and reconstruction of the garage that stands within twenty-five feet of where the defendant's van was parked on January 18, 1996 – make a jury view of this area not only of questionable value but also possibly misleading and confusing to the jury. Further, as stated above, both parties have indicated that they anticipate using photographs, testimony, and diagrams to demonstrate their respective contentions. Thus, given the ample evidence concerning this area and given the now changed physical characteristics of the scene, the Court **DENIES** defendant's request for a jury view of the alleged crime scene at 585 Reinhard Avenue.

... [T]he defendant has requested that the items removed by law enforcement from the van be returned to approximately the same position for the jury view. The government is opposed to this request because no measurements were taken of the location of these items in the van, although numerous photographs were taken of these items.

In the Court's view, given that no measurements were taken, it would be virtually impossible to return the items to their location in the van. Thus, a jury view of these contents in the van could be misleading and confusing to the jury. Because of this factor, and because there are numerous photographs of these items, the Court **DENIES** the defendant's request to have the items contained in the

84

van returned to the van for the jury view of the van.

Doc. #401.

Petitioner's claim that he was denied a fair trial due to the Court's ruling in this regard was not raised on direct appeal. Petitioner therefore now must establish cause for his failure to raise the claim on direct appeal and actual prejudice resulting from the error before this claim may be considered here. *Napier v. United States*, *supra*, 59 F.3d at 961; *United States v. Frady*, *supra*, 456 U.S. at 167-68. Petitioner again asserts the ineffective assistance of counsel as cause for his procedural default of claim nine. *See Traverse.*

"It is well-established that the decision whether to grant [a jury view] rests within the discretion of the trial court and is reviewable only for abuse of that discretion.... The district court is permitted to weigh a variety of factors involving the fair and efficient conduct of the trial in ruling on such a matter." *United States v. Woolfolk*, 197 F.3d 900, 905 (7th Cir. 1999)(citations omitted); *see also United States v. Triplett*, 195 F.3d 990, 999 (8th Cir. 1999)(the decision whether to permit a jury view of the crime scene is highly discretionary), citing *United States v. Passos-Paternina*, 918 F.2d 979, 986 (1st Cir. 1990). For the reasons stated in this Court's order denying petitioner's request for a jury view, petitioner simply has failed to establish that this Court abused its discretion in denying petitioner's request. *United States v. Crochiere*, 129 F.3d 233, 236 (1st Cir.1997) ("Although a view might have had some indirect impact on the jury's assessment of witness credibility, Crochiere had ample opportunity to, and did, impeach the witnesses' credibility in a variety of ways at trial."); *United States v. Johnson*, 767 F.2d 1259, 1273 (8th Cir.1985) ("Because a jury view would have been time-consuming and

85

cumulative of photographic evidence and the testimony, the district court did not abuse its

discretion in denying the view request.")  Petitioner has failed to establish the ineffective

assistance of counsel for failing to raise this issue on direct appeal.  Petitioner has likewise failed

to establish cause and prejudice for his procedural default of claim nine.

### XI.  CLAIM TEN - SPEEDY TRIAL

In claim ten, petitioner asserts that he was denied his right to a speedy trial.  Again,

petitioner failed to raise this claim on direct appeal; he therefore must establish cause for his

failure to raise such claim earlier, as well as actual prejudice resulting from the error, before this

claim may be considered here.  *Napier v. United States*, *supra*, 59 F.3d at 961; *United States v.

Frady*, *supra*, 456 U.S. at 167-68.  Petitioner again asserts the ineffective assistance of counsel

as cause for his procedural default.  *See Traverse*.

The Sixth Amendment to the United States Constitution guarantees a criminal

defendant's right to a speedy trial.  U.S. Const.,  amend. VI.  The United States Supreme Court

has established a balancing test in which four factors must be weighed in evaluating whether the

right to a speedy trial has been violated: 1) the length of the delay; 2) the reason for the delay; 3)

the defendant's assertion of his right; and 4) prejudice to the defendant.  *Barker v. Wingo*, 407

U.S. 514, 530 (1972).

The length of the delay for speedy trial purposes is measured from the earlier of the date

of the indictment or the date of the arrest.  *Cain v. Smith*, 686 F.2d 374, 381 (6th Cir. 1982).  The

delay must be presumptively prejudicial before the court need inquire into the other factors that

go into the balance.  *Barker*, 407 U.S. at 530.  Whether the delay is presumptively prejudicial is

determined by the nature and complexity of the crime.  *Redd v. Sowders*, 809 F.2d 1266, 1269

(6th Cir. 1987). The more serious the crime, the shorter the toleration of delay. *Id.*

> In *Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120
> L.Ed.2d 520 (1992), the Supreme Court noted that, in general, a
> delay that approaches one year is considered presumptively
> prejudicial, depending on the nature and seriousness of the
> charges. *Id*. at 652 n. 1, 112 S.Ct. 2686. In [*United States v.
> ]White*, [985 F.2d 271 (6ᵗʰ Cir. 1993)]this court determined that a
> six-and-one-half month delay in trying defendants accused of
> attempted possession of cocaine with intent to distribute and using
> and carrying a firearm in connection with drug trafficking was not
> presumptively prejudicial. *See White*, 985 F.2d at 275.

*Norris v. Schotten,* 146 F.3d 314, 327 (6ᵗʰ Cir. 1998).

The *Barker* balancing test also requires the Court to determine the amount of prejudice

that the defendant has suffered. Prejudice must be assessed in view of the interests the guarantee

of a speedy trial is designed to protect: 1) to prevent oppressive pretrial incarceration; 2) to

minimize anxiety and concern of the accused; 3) to limit the possibility that the defense will be

impaired. *Barker*, 407 U.S. at 532. The third interest is the most important. *Id*.

Additionally, the Speedy Trial Act, 18 U.S.C. §3161(c)(1), provides in relevant part:

> In any case in which a plea of not guilty is entered, the trial of a
> defendant charged in an information or indictment with the
> commission of an offense shall commence within seventy days
> from the filing date (and making public) of the information or
> indictment, or from the date the defendant has appeared before a
> judicial officer of the court in which such charge is pending,
> whichever date last occurs.

However, pursuant to 18 U.S.C. §3161(h)(8), any delay resulting from a defendant's request for

a continuance is excluded from computing the time within which trial must commence:

> (A)... if the judge granted such continuance on the basis of his
> findings that the ends of justice served by taking such action
> outweigh the best interest of the public and the defendant in a
> speedy trial. No such period of delay resulting from a continuance
> granted by the court in accordance with this paragraph shall be

excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

(B)The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

*Id.*

Petitioner was arrested on January 19, 1996. On February 15, 1996, the indictment against him was filed. Doc. #8. The Court scheduled trial to commence on April 1, 1996. Doc. #13. On March 15, 1996, however, petitioner filed a motion to vacate and continue the trial date.

Doc. #30.  On March 28, 1996, the Court granted petitioner's request:

> Counsel for defendant states that additional time is needed to complete discovery and to prepare for trial, in part because he has not received information that he believes is subject to disclosure and because he still needs to inspect objects in the possession of the government.  (FN1)....
>
> (FN1): The Court also notes that a superseding indictment adding charges against defendant was filed in this case after defendant filed his motion to vacate and continue the trial date.
>
> In view of these representations by counsel, the Court is satisfied that failure to grant the request for continuance would deny counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.  18 U.S.C. §3161(h)(8)(B)(iv).  The Court further finds that the present motion has not been filed for the purpose of delay and that the continuance is necessary to allow counsel the reasonable time necessary to prepare this case.  In light of the representations of counsel, the Court is satisfied that the failure to grant the continuance would likely result in a miscarriage of justice.  18 U.S.C. §3161(h)(8)(B)(i).
>
> For the foregoing reasons, the Court concludes that the ends of justice served by granting the request for continuance outweigh the best interest of the public and the defendant in a speedy trial.  18 U.S.C. §3161(h)(8)(A).

Doc. #35.[25]  On July 12, 1996, petitioner again filed a motion to vacate and continue the trial

date.  Doc. #102.  On July 19, 1996, the Court granted petitioner's request:

> Relevant to this Court's decision are the factors set forth in the Speedy Trial Act , 18 U.S.C. §3161(h)(B)(i) and (iv).  Counsel for the defendant states that additional time is needed to complete discovery and to prepare for trial, in part because of the recent receipt of DNA test results and the time needed to prepare for a suppression hearing related to this evidence and in part because

---

[25]  Additionally, on May 8, 1996, and on May 28, 1996, petitioner filed motions to extend the deadline to file motions (Docs. #47, 59), which motions were granted.  Doc. #52, 65.

> defendant has not yet inspected objects in the possession of the
> government. Counsel for the government does not oppose this
> motion.
>
> In view of these representations by counsel, the Court is satisfied
> that failure to grant the request for continuance would deny
> counsel the reasonable time necessary for effective preparation,
> taking into account the exercise of due diligence. 18 U.S.C.
> §3161(h)(8)(B)(iv). The Court further finds that the present
> motion has not been filed for the purpose of delay and that the
> continuance is necessary to allow counsel the reasonable time
> necessary to prepare this case. In light of the representations of
> counsel, the Court is satisfied that the failure to grant the
> continuance would likely result in a miscarriage of justice. 18
> U.S.C. §3161(h)(8)(B)(i).

Doc. #117. On September 30, 1996, petitioner filed a third motion to vacate and continue the

trial date. Doc. #173. On October 3, 1996, the Court granted petitioner's request:

> Relevant to the Court's decision are the factors set forth in the
> Speedy Trial Act , 18 U.S.C. §3161(h)(8)(B)(i) and (iv). Counsel
> for defendant states that additional time is needed to complete
> discovery and to prepare for trial, in part because of the volume of
> certain material, which the government has identified as *Giglio*
> material, that the government has agreed to provide to the
> defendant prior to trial and in part because defendant awaits a
> written report on a DNA test from the government, which the
> government states it has not yet received. Counsel for the
> government does not oppose this motion.
> In view of the representations by counsel, the Court is satisfied that
> failure to grant the request for continuance would deny counsel the
> reasonable time necessary for effective preparation, taking into
> account the exercise of due diligence. 18 U.S.C.
> §3161(h)(8)(B)(iv). The Court further finds that the present
> motion has not been filed for the purpose of delay and that the
> continuance is necessary to allow counsel the reasonable time
> necessary to prepare this case. In light of the representations of
> counsel, the Court is satisfied that the failure to grant the
> continuance would likely result in a miscarriage of justice. 18
> U.S.C. §3161(h)(8)(B)(i).

Doc. #175. On December 16, 1996, jury selection commenced. *See* Docs. #179.

On February 13, 1997, three days after petitioner's first jury trial concluded, the Court scheduled petitioner's second trial to begin on May 12, 1997.  Docs. #292; 296.  On April 24, 1997, however, petitioner filed a motion to vacate and continue that trial date.  Doc. #329.  On April 29, 1997, the Court granted petitioner's request:

> Relevant to the Court's decision are the factors set forth in the Speedy Trial Act, 18 U.S.C. §3161(h)(8)(B)(i) and (iv).  Counsel for the defendant state that additional time, specifically one week, is needed to complete discovery and to prepare for trial.  Counsel for the government... does not oppose this motion.
>
> In view of these representations by counsel, the Court is satisfied that failure to grant the request for continuance would deny counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.  18 U.S.C. §3161(h)(8)(B)(iv).  The Court further finds that the present motion has not been filed for the purpose of delay and that continuance is necessary to allow counsel the reasonable time necessary to prepare this case.  In light of the representations of counsel, the Court is satisfied that the failure to grant the continuance would likely result in a miscarriage of justice.  18 U.S.C.  §3161(h)(8)(B)(i).

Doc. #330.  On May 12, 1997, petitioner again filed a motion to vacate and continue trial date.

Doc. #350.  On May 14, 1997, the Court granted petitioner's request:

> Relevant to the Court's decision are the factors set forth in the Speedy Trial Act, 18 U.S.C. §3161(h)(8)(B)(i) and (iv).  Counsel for the defendant state that additional time is needed to complete discovery and to prepare for trial.  Defendant detailed the items which he seeks to have disclosed in a motion to compel discovery, also filed on May 12, 1997.  On May 13, 1997, the government filed a response to the request for a continuance in which government counsel state that there is no objection to a continuance if defense counsel need additional time to prepare for trial.
>
> In view of these representations by counsel, the Court is satisfied that failure to grant the request for continuance would deny counsel the reasonable time necessary for effective preparation,

> taking into account the exercise of due diligence.  18 U.S.C.
> §3161(h)(8)(B)(iv).  The Court further finds that the present
> motion has not been filed for the purpose of delay and that the
> continuance is necessary to allow counsel the reasonable time
> necessary to prepare this case.  In light of the representations of
> counsel, the Court is satisfied that the failure to grant the
> continuance would likely result in a miscarriage of justice.  18
> U.S.C. §3161(h)(8)(B)(i).

Doc. #352.  On August 25, 1997, jury selection commenced in petitioner's second trial.

Thus, neither of the trials in this case violated the Speedy Trial Act.  *See* 18 U.S.C.

§3161(h)(8).  Where the defendant requested the

> continuance, he is barred from arguing that it was not in the
> interests of justice. *Cf. United States v. Monroe*, 833 F.2d 95, 99
> (6th Cir.1987) (holding that a defendant could not object to the
> exclusion of a period of time from the Speedy Trial Act
> computation when defendant's "counsel specifically consented to
> the exclusion of this time in the interest of justice and thereby
> waived any objections thereto").

Such are the circumstances here.  Petitioner was denied neither his constitutional nor his

statutory right to a speedy trial.  All the continuances granted in this case were granted at the

request of the defendant, so that he could better prepare a defense.  Petitioner never asserted his

right to a speedy trial.  To the contrary, petitioner expressly requested the Court to reschedule the

trial dates.

Petitioner has therefore failed to establish the ineffective assistance of counsel due to his

attorney's failure to raise a speedy trial claim on appeal; he has likewise failed to establish  cause

or prejudice for his procedural default of claim ten.

### XII.  CLAIM ELEVEN - DOWNWARD DEPARTURE DUE TO MENTAL ILLNESS

In claim eleven, petitioner asserts that the Court improperly refused to grant a downward

departure of petitioner's sentence based upon petitioner's mental illness.  Again, petitioner failed

92

to raise this claim on direct appeal. He therefore must establish cause for his failure to earlier present such claim, as well as actual prejudice from the alleged error before claim eleven will be considered on collateral review. *Napier v. United States, supra, citing United States v. Frady, supra*. Petitioner again asserts the ineffective assistance of counsel as cause for his procedural default of this claim.

The record indicates that the Court denied petitioner's request for a downward departure from the sentencing guidelines pursuant to U.S.S.G. § 5H1.4[26] as follows:

> It would appear from the defendant's testimony yesterday... that his real concern is about being subjected to physical abuse in the event that at some point in the future, he "comes out", meaning openly declares to the prison population that he has a sexual identity disorder and regards himself more of a female than a male, and especially if he succeeds in having the Bureau of Prisons approve surgery to further his preferred sexual identity. These events may or may not occur in the future, and the Court refuses to render a decision based on this type of speculation.
>
> Assuming that the Court does have the authority to depart downward based upon the defendant's mental disorder, the Court does not believe that this is such an extraordinary case that such departure is warranted, and the Court, in the exercise of its discretion, declines to make such a departure.
>
> Parenthetically, it should be noted that even if the Court were to depart downward from the guideline range, it has no authority to depart below the statutory mandatory minimum sentences applicable in this case. In short, in other words, there's no departure downward that would eliminate the necessity that the

---

[26] U.S.S.G. § 5H1.4 provides:

Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

defendant be incarcerated under the statutory mandate.

*Sentencing Transcript*, January 22, 1999, at 45-46.

"[A] district court's discretionary decision not to depart downward from the Guidelines range ordinarily is not appealable." *United States v. Cole,* 359 F.3d 420, 427 (6th Cir. 2004), quoting *United States v. Burke*, 237 F.3d 741, 745 (6th Cir. 2001). Additionally, as noted by the Court, petitioner was sentenced on count five to a mandatory minimum term of life imprisonment pursuant to 18 U.S.C. §924(c)(1)(A):

> Any person who, during and in relation to a crime of violence... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence....
>
> ***
>
> (C) In the case of a second or subsequent conviction under this subsection...
>
> (ii) if the firearm involved is a machinegun or destructive device... be sentenced to imprisonment for life.

*See Sentencing Transcript*, at 52-55; Doc. #491. Because petitioner was subject to a mandatory minimum sentence, the Court lacked authority to grant a downward departure based upon petitioner's mental or physical condition.

> [D]istrict courts cannot impose a sentence below a statutory mandatory minimum. An exception to this rule exists if the government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure based on the defendant's "substantial assistance" to the authorities. In this case, [defendant] provided no such assistance to the government, and thus the district court had no authority to depart from the mandatory minimum five-year sentence imposed under 18 U.S.C. § 924." *Ibid. (citation omitted)*.
>
> *In United States v. Santiago,* 201 F.3d 185, 187 (3rd Cir.1999), the Third Circuit held that "[a]ny deviation from the statutory

94

minimum sentence can only be had through the specific procedures established through 18 U.S.C. §§ 3553(e), 3553(f), which are not applicable here." In *United States v. Polanco,* 53 F.3d 893 (8th Cir.1995), the Eighth Circuit found that "[s]ection 3553(b) and guideline section 5K2.0 do not permit departure below the statutory mandatory minimum.... Without a section 3553(e) motion or the unconstitutional refusal of one, the district court had no authority to depart below the statutory minimum." *Id.* at 897 (citation omitted). Both the Seventh and Eleventh Circuits have issued similar holdings. *See United States v. Brigham,* 977 F.2d 317, 320 (7th Cir.1992) (holding that "a departure from a minimum sentence prescribed by statute ... was available only on motion of the prosecutor under section 3553(e)."); *United States v. Reynolds,* 215 F.3d 1210, 1215 (11th Cir.2000) (denying the existence of discretion to go below statutory minimum based on grounds other than substantial assistance). *See also United States v. Daniels,* No. 98-4732, 1999 WL 496594 (4th Cir. Jul.13, 1999) (unpublished) (holding to the same effect).

Our own practice is consistent with this ubiquitous jurisprudence. "Apart from what has been set forth relative to departures for substantial assistance, there is no authorization for a departure below a mandatory statutory minimum." *United States. v. Liggins,* No. 92-5604, 1993 WL 20135 (6th Cir. Jan. 28, 1993) (unpublished). In a published case involving a defendant's poor health, we found "[d]espite [defendant]'s compelling circumstances, the district court had no discretion to impose a sentence below the statutory minimum." *United States v. Smith,* 966 F.2d 1045, 1050 (6th Cir.1992) (vacating downward departure from statutory minimum for marijuana production). "As the guidelines themselves recognize, where a statutory mandatory minimum sentence and the guidelines conflict, the guidelines must yield, and the statutory minimum sentence prevails." *United States v. Goff,* 6 F.3d 363, 366-67 (6th Cir.1993) (citing USSG § 5G1.1(b)).

*United States v. Burke*, *supra,* 237 F.3d at 745; *see also United States v. O'Dell*, 320 F.3d 674, 682 (6th Cir. 2003).

Further, petitioner's sentence has been affirmed by the United States Court of Appeals for the Sixth Circuit:

95

As his final claim of error, Langan maintains that the district court improperly enhanced his sentence under 18 U.S.C. § 924(c)(1). Specifically, Langan objects to the treatment of Counts 2, 4, and 5 as "second or subsequent convictions," arguing in "good faith" that his life sentence should be reversed. The district court's application of 18 U.S.C. § 924(c) is a question of law which we review *de novo*. *See United States v. Deal,* 954 F.2d 262, 262-63 (5th Cir.1992), *aff'd,* 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).

Langan frankly acknowledges that the basis of his objection is in direct conflict with the Supreme Court's holding in *Deal v. United States,* 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). As the Supreme Court explained, if a defendant is charged with and convicted of separate offenses to which § 924(c) applies, the separate convictions on the associated § 924(c) counts can be used to determine previous and subsequent convictions. *See Deal,* 508 U.S. at 132-34, 113 S.Ct. 1993 (1993). Because Langan was convicted of the two separate and distinct armed robbery violations, his § 924(c) convictions relating to those underlying violations qualify as a previous and subsequent conviction. Nevertheless, Langan argues that *Deal* should be overruled. We are of course without authority to disregard controlling Supreme Court precedent. Langan's challenge to his sentence is therefore rejected. Accordingly, the district court did not err in enhancing Langan's sentence for the second § 924(c)(1) conviction.

*United States v. Langan, supra*, 263 F.3d at 626-27.

Petitioner has failed to establish that he was denied the effective assistance of counsel under the test set forth in *Strickland* by reason of his attorney's failure to raise on direct appeal a claim based on this Court's refusal to grant a downward departure. Petitioner has likewise failed to establish cause or prejudice for his procedural default of this claim.

96

**VIII.**

Based upon all of the foregoing, all of petitioner's claims are **DISMISSED.**  Petitioner's

unopposed request that the Whitehurst documents filed under seal be unsealed is **GRANTED**.

*See Traverse,* at 10.  Petitioner's motion for reconsideration (Doc. #568) of the Court's

December 2, 2004, order (Doc. #567) is **DENIED.**

**IT IS SO ORDERED.**

Date: April 15, 2005                                              **/s/ John D. Holschuh**
                                                                 JOHN D. HOLSCHUH
                                                                 United States District Judge

97